**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PRESSURE SENSITIVE** | : | |
| **LABELSTOCK ANTITRUST** | : | |
| **LITIGATION** | : | **MDL Docket No. 1556** |
| | : | **(No. 3:03-MDL-1556)** |
| | : | **(All Cases)** |
| | : | |
| | : | **(JUDGE VANASKIE)** |
| | : | |

**MEMORANDUM**

This matter is before the Court on Plaintiffs' Motion for Class Certification and Appointment of Class Counsel pursuant to Federal Rule of Civil Procedure 23. (Dkt. Entry 244.) This case arises from alleged violations of federal antitrust law. Plaintiffs and putative class representatives – Scranton Label, Inc., Bertek Systems, Inc., McCarty Printing Corporation, Glenroy, Inc., and Pamco Tape & Label, Inc. – claim Defendants conspired to restrain trade in the sale and distribution of self-adhesive labelstock, also known as pressure sensitive labelstock ("PSL"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15(a).

Plaintiffs are in the business of processing and converting PSL for sale to their customers. Plaintiffs allege Defendants Avery Dennison Corporation ("Avery"); Bemis Company, Inc. ("Bemis"); Bemis's wholly-owned subsidiary, Morgan Adhesives Company ("MACtac"); UPM-Kymmene Corporation ("UPM"); and UPM's wholly-own subsidiary, Raflatac,

Inc. ("Raflatac"), PSL producers, "conspired [from as early as January 1, 1996, to as late as July 25, 2003] to fix, raise, maintain or stabilize prices for self-adhesive labelstock . . . and to allocate and restrict output in the market for self-adhesive labelstock sold in the United States." (Second Am. & Consol. Class Action Compl. ("Second Am. Compl."), Dkt. Entry 190, ¶ 1.)  As a consequence of Defendants' allegedly unlawful behavior, Plaintiffs claim they purchased PSL at prices higher than would otherwise have prevailed in a competitive market.  They have instituted this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of the suit, including reasonable attorneys' fees.

Plaintiffs seek certification of the following class:

> All persons (excluding governmental entities, Defendants, co-conspirators, other producers of self-adhesive labelstock, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased self-adhesive labelstock in the United States directly from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1996 to July 25, 2003.

(Pls.' Mot. Class Certification & Appointment of Class Counsel, Dkt. Entry 244, at 1-2.) Plaintiffs also request this Court appoint as Class Counsel the following firms: Trujillo Rodriguez & Richards, L.L.C.; Lockridge Grindal Nauen, P.L.L.P.; Cohen Milstein Hausfeld & Toll, P.L.L.C.; and Keating Muething & Klekamp., P.L.L.  (Id. at 2.)  Finally, Plaintiffs ask the Court to continue the appointment of O'Malley & Langan, P.C., as Liaison Counsel for the Plaintiff Class.  (Id.)

Having carefully considered the parties' extensive briefs, expert reports, exhibits, and oral argument presentations, the Court finds that Plaintiffs have satisfied the requirements for class certification under Rule 23(a) and (b)(3).  Accordingly, with a slight modification to the definition of the Plaintiff class, the Court will grant the class certification motion.  In addition, the Court will appoint Class Counsel and continue the appointment of Liaison Counsel as requested by Plaintiffs.

# I. BACKGROUND

## A. Factual Background

PSL, or self-adhesive labelstock, is used to create labels for numerous products and uses.  (Second Am. Compl. ¶¶ 33.)  PSL products are pre-coated with an adhesive that is activated by pressure and adheres to a surface by "press-on contact."  (Id. ¶ 32.)  Labels produced with PSL serve myriad functions, including price labels, product information labels, promotional labels, and product monitoring labels.  (Id. ¶ 33.)  PSL products are utilized by a variety of industries, including food and beverage, consumer goods, health and beauty, and pharmaceuticals.  (Id.)

PSL consists of four components: the face material, adhesive, release layer, and base material.  (Id. ¶ 36.)  The face material is made from paper, film, foil, or fabric, and is where the information is printed.  (Id.)  The adhesive, which is permanent or removable, affixes the label to the desired surface.  (Id.)  The release layer, generally made of silicon, allows the simple

release of the face material from the base material.  (Id.)  Lastly, the base material guards the adhesive from premature contact with unintended surfaces.  (Id.)

PSL is manufactured on coating lines.  The silicone release layer and then the adhesive are applied to the base material.  (Aff. of John C. Beyer ("Beyer Aff."), Dkt. Entry 247-30, ¶ 14.) The base material, in turn, is laminated to the face material.  (Id.)  Once produced, the PSL is sold in rolls or sheets primarily to label converters, printers, paper merchants, or distributors. (Id. ¶¶ 14, 16.)  These businesses process PSL into finished labels according to the requirements or specifications of their customers, the end users.  (Id. ¶ 16.)

According to the Tag and Label Manufacturers Institute, Inc. ("TLMI"), the industry trade association, there are fifteen product categories of PSL, which are grouped together based upon the nature of the face material: paper, film, foil, or piggyback.  (Id. ¶ 17.)  Most PSL is paper-based: in 1996, 85.3% of PSL was paper-based, while in 2003 that figure decreased slightly, to 80.1%.  (Beyer Aff. (Table 1).)  Film-based PSL accounted for 12.8% and 18.2%, respectively, of shipments in 1996 and 2003.  (Id.)

Paper-based and film-based PSL are converted into prime labels or variable information printing ("VIP") labels.  (Second Am. Compl. ¶ 35.)  Prime labels are used for promotions and product identification.  (Id.)  The information is printed thereon by the converters and is not altered by the end user.  VIP labels, by contrast, are sold blank or partially blank, and the information is printed by the end user when the label is applied.  (Id.)  Supermarket deli counter

4

labels are a familiar example of VIP labels.

Defendants are major producers of PSL in the United States, and one or more Defendants sell or distribute PSL in every state except the District of Columbia and Wyoming. (Beyer Aff. (Table 6).)  In 2003, Avery, MACtac, and Raflatac had an aggregate share of the PSL market of approximately 78%; in 2002, these Defendants controlled 63% of North American industry capacity and accounted for 67.2% of the PSL sold in North America.  (Beyer Aff. (Tables 4 & 5).)

Avery is the largest producer of PSL.  In 2003, Avery had PSL sales of $957.2 million, constituting approximately 54% of the PSL sold in the United States.  (Beyer Aff. ¶¶ 32-33.)

MACtac, Bemis's wholly-owned subsidiary, had PSL sales in 2003 of $194.9 million, constituting 13% of the United States market.  (Id.)  Raflatac sold $147 million of PSL in 2003, representing approximately 12% of the United States market.  (Id.)

Raflatac's parent, UPM, is a Finnish holding company active in the forestry products industry.  (Second Am. Compl. ¶ 18.)  UPM is also a major supplier of paper used to manufacture PSL.  (Id.)  Throughout the class period, UPM supplied paper to Avery, and this supply arrangement is a critical element of Plaintiffs' antitrust claims.

Plaintiffs allege Defendants conspired to fix the prices of and allocate the market for PSL.  Plaintiffs' Second Amended Complaint relates the following: In the early 1990s, Avery competed with Raflatac in the European PSL market.  (Second Am. Compl. ¶ 47.)  Raflatac

seized a large market share from Avery by introducing low-priced PSL products.  (Id.)  Avery

feared UPM and Raflatac would repeat this conduct in the United States.  Thus, in 1996, Avery

sought to dissuade Raflatac's entry into the United States market by purchasing paperstock

from UPM.  (Id. ¶ 48.)  Avery's objective was to "[b]uy enough product to make [UPM] think

twice about building coaters in the US."  (Ex. 3 to Bruckner Decl., Dkt. Entry 247-4, at 2.)  Avery

and UPM purportedly reached an understanding that included UPM agreeing to sign a non-

disclosure agreement to "foste[r] a 'global partnership' between [Avery] and [UPM]."  (Ex. 4 to

Bruckner Decl., Dkt. Entry 247-5, at 2.)  Plaintiffs allege that as early as 1996 Avery agreed to

purchase large quantities of paperstock from UPM in consideration for UPM's promise to refrain

from competing in the United States PSL market.  (Second Am. Compl. ¶ 48.)

Plaintiffs allege MACtac, who also perceived Raflatac as a threat, was aware of the

Avery-UPM agreement.  (Id. ¶ 49; see Ex. 5 to Bruckner Decl., Dkt. Entry 247-6, at 15 (internal

MACtac planning document noting, in its assessment of Raflatac, that "Avery has deal to buy

paper if [UPM/Raflatac] will stay out of U.S. market").)  Plaintiffs further contend that Avery and

MACtac had their own arrangement to limit competition among themselves in the PSL market.

(Second Am. Compl. ¶¶ 44-45.)  In this regard, Plaintiffs allege MACtac instructed its sales

personnel not to target Avery's customers and admonished its personnel not to quote prices

below Avery's.  (See Exs. 8-10 to Bruckner Decl., Dkt. Entries 247-9 to 247-11.)  Plaintiffs

assert that the decision to refrain from competition was contrary to Defendants' economic

interest because there was excess manufacturing capacity at the time.  (Second Am. Compl. ¶ 45.)

Despite its alleged agreement with Avery to refrain from competing in the United States market, Plaintiffs allege Raflatac was attracted by the North American profit margins, albeit, as Plaintiffs contend, supra-competitively set by Defendants' anticompetitive behavior.  (Id. ¶ 51.) Initially, UPM, through Raflatac, sought to gain market share by acquiring another producer. (Id. ¶ 50.)  UPM approached Bemis about acquiring MACtac; Bemis, however, rejected UPM's overture.  (Id.)  Since UPM could not acquire market share, it decided to construct a Raflatac facility in North Carolina, which opened in 2001.  (Id. ¶ 52.)  UPM's intent was to avoid targeting Avery's customers, but instead to compete aggressively for other manufacturers' business. (Id.; see also Ex. 12 to Bruckner Decl., Dkt. Entry 247-13, at 2.)  Nevertheless, Raflatac's expansion caused an across-the-board decline in PSL prices.  (Second Am. Compl. ¶ 56.) Plaintiffs claim that, had Raflatac entered the United States market earlier, PSL purchasers would have enjoyed lower prices sooner.

Meanwhile, Plaintiffs allege Avery and MACtac sought to stabilize PSL prices in anticipation of Raflatac's expansion.  At the TLMI meeting in October of 2002, a MACtac employee reported that Avery and MACtac discussed Raflatac's entry and the need for uniform price increases.  (Id. ¶ 54.)  At that time, MACtac was considering price increases, including surcharges, but was hesitant due to fear it would lose business if its competitors declined to

follow its initiative.  (Id. ¶ 55.)  Following the TLMI meeting, however, MACtac increased prices by implementing a freight surcharge, an increase for solvent adhesive constructions, and a currency exchange surcharge for Canadian orders.  (Id.)  Avery and other competitors soon increased their prices.  (Id.; Ex. 18 to Bruckner Decl., Dkt. Entry 247-19, at 2.)

After Raflatac's 2001 United States expansion and consequent lower PSL prices, Plaintiffs allege Avery and Raflatac accused one another of lowering prices.  Avery threatened to reduce significantly its paperstock purchases from UPM "'due to lack of trust between UPM and Avery and UPM/Raflatac's active market penetration.'" (Second Am. Compl. ¶ 56 (quoting Ex. 20 to Bruckner Decl., Dkt. Entry 247-21, at 2).)  To appease Avery, Plaintiffs allege Raflatac "reinstructed" its sale force on price discipline, and agreed with Avery to limit price competition. (Second Am. Compl. ¶¶ 57-58, 60.)  Plaintiffs contend Bemis and MACtac knew of this agreement.  (Id. ¶ 62.)

Plaintiff's allege that, in addition to appeasing Avery's demands regarding price competition, Raflatac devised a plan to acquire market share without competition: Raflatac would try again to acquire MACtac from Bemis.  (Id. ¶ 58.)  According to Plaintiffs, this acquisition would achieve three objectives: "(1) secure [UPM]'s goal of a 20% market share, (2) control and neutralize MACtac's excess capacity, and (3) avoid head to head competition between [UPM] and Avery."  (Id. ¶ 59.)  Although Bemis had rejected UPM's initial offer, it agreed this time to sell MACtac in order to "prevent a pricing 'blood bath,'" and to avoid "long

term damage to pricing in [the] North American market." (Id. ¶ 62; Ex. 21 to Bruckner Decl.,

Dkt. Entry 247-22, at 2.)  MACtac's CEO indicated the transaction would "discipline" UPM's

pricing of PSL, a statement Plaintiffs contend is nonsensical "unless Bemis and MACtac knew

of [UPM]'s collusive agreement with Avery to exercise price discipline." (Second Am. Compl. ¶

62.)

The proposed acquisition was announced in August, 2002.[1]  (Id. ¶ 63.)  In December,

2002, the United States Department of Justice requested additional information from Bemis

regarding the pending sale of MACtac.  (Id. ¶ 64.)  On April 15, 2003, the Justice Department

filed a complaint in the United States District Court for the Northern District of Illinois to enjoin

the pending acquisition (the "DOJ Merger Litigation").  (Id. ¶ 66.)  The Justice Department

concluded the acquisition would result in higher prices.  (Id. ¶ 65.)  In this regard, the Justice

Department's investigation revealed that competitors in the PSL industry "'have sought to

coordinate rather than compete,'" and the acquisition would increase the probability that UPM

and other competitors would collude on prices.  (Id. ¶ 66.)  On July 25, 2003, the district court

enjoined the acquisition, reasoning it would stifle competition and harm consumers.[2]  See

---

[1]In addition to the sale of MACtac to UPM, UPM agreed to sell Walki Films, its European
flexible packaging entity, to Bemis.  (Second Am. Compl. ¶ 61.)  The sale of Walki Films was
completed in October, 2002.  (Id. ¶ 63.)

[2]In the DOJ Merger Litigation, UPM and Bemis defended its transaction by arguing that
MACtac was a "weakened competitor," and that the acquisition was essential to MACtac's
survival in the PSL industry.  See UPM-Kymmene Oyj, 2003 WL 21781902, at *10.  The district
(continued...)

United States v. UPM-Kymmene Oyj, No. 03 C 2528, 2003 WL 21781902 (N.D. Ill. July 25, 2003).

### B. Procedural History

In the wake of the DOJ Merger Litigation, nine civil actions were filed in four federal judicial districts – including one action in this Court – by PSL purchasers alleging Defendants conspired to violate federal antitrust law.  On November 5, 2003, the Judicial Panel on Multidistrict Litigation transferred to this Court the actions pending outside of this district for consolidated pretrial proceedings.  In re Pressure Sensitive Labelstock Antitrust Litig., 290 F. Supp. 2d 1374, 1376 (J.P.M.L. 2003).

On February 16, 2004, Plaintiffs filed an Amended and Consolidated Class Action Complaint alleging Defendants conspired from as early as January 1, 1999, to fix, raise, maintain, or stabilize prices for PSL sold in the United States.  (Dkt. Entry 46, ¶ 1.)  Plaintiffs also alleged that Defendants fraudulently concealed the conspiracy.  (Id. ¶¶ 69-71.)  Defendants Bemis and MACtac moved to dismiss the amended complaint.  The motion was denied by Memorandum and Order dated February 15, 2005.  See In re Pressure Sensitive

---

[2](...continued)
court rejected this argument, concluding MACtac was non-competitive because Bemis elected not to compete.  Id. at *11.  After the acquisition was enjoined, MACtac instructed its sales representatives to reassure customers that MACtac was a profitable company, and that its weakened-competitor argument was a litigation strategy, not a reflection of its actual state.  (See Ex. 22 to Bruckner Decl., Dkt. Entry 247-23.)

Labelstock Antitrust Litig., 356 F. Supp. 2d 484, 495 (M.D. Pa. 2005).

The parties then engaged in discovery limited to class certification issues. During the course of discovery, Plaintiffs uncovered evidence of what they allege broadened the conspiracy to encompass market allocation and supply restriction, and that this conduct began as early as January 1, 1996. Plaintiffs subsequently moved to file the Second Amended and Consolidated Class Action Complaint. (Dkt. Entry 149.) On January 3, 2006, the Court granted Plaintiffs' motion. See In re Pressure Sensitive Labelstock Antitrust Litig., MDL No. 1556, No. 3:03-MDL-1556, 2006 WL 433891 (M.D. Pa. Jan. 3, 2006).

On August 14, 2006, Plaintiffs moved for class certification and appointment of class counsel. (Dkt. Entry 244.) Additionally, Plaintiffs filed a Declaration of Ira Neil Richards, (Dkt. Entry 245); a Memorandum of Law in Support of Motion for Class Certification, (Dkt. Entry 246); supporting exhibits, (Dkt. Entries 247 to 247-29); and an affidavit from their economics expert, Dr. John C. Beyer. (Dkt. Entries 247-30 & 247-31.) Defendants filed a Memorandum of Law in Opposition to Motion for Class Certification, (Dkt. Entry 254); exhibits, (Dkt. Entries 256, 254-2 to 254-12); and an affidavit from their economics expert, Dr. Andrew S. Joskow. (Dkt. Entry 255.) On December 4, 2006, Plaintiffs filed a Reply Memorandum of Law in Support of Motion for Class Certification, (Dkt. Entry 264); exhibits, (Dkt. Entries 265 to 265-34); and a reply affidavit from Dr. Beyer. (Dkt. Entry 263.) Pursuant to this Court's Order of December 15, 2006, (Dkt. Entry 272), Defendants filed a Sur-rebuttal Memorandum of Law in Opposition to

Motion for Class Certification, (Dkt. Entry 275); exhibits, (Dkt. Entry 276); and a surrebuttal affidavit from Dr. Joskow.  (Dkt. Entry 277.)  Pursuant to the same Order, Plaintiffs filed a Memorandum of Law in Response to Defendants' Sur-rebuttal to Plaintiffs' Motion for Class Certification, (Dkt. Entry 282); exhibits, (Dkt. Entries 282-2 to 282-6); and the third affidavit of Dr. Beyer.  (Dkt. Entry 282-7.)  Oral argument was conducted on March 1, 2007.[3]

## II. DISCUSSION

### A. Standard for Class Certification

The Federal Rules of Civil Procedure allow for the prosecution of claims as a class action provided the following prerequisites are satisfied:

> (1) the class is so numerous that joinder of all members is
> impracticable [("numerosity")], (2) there are questions of law or

---

[3]Plaintiffs notified the Court of "supplemental authority" on May 3, 2007, (Dkt. Entry 293); July 20, 2007, (Dkt. Entry 298); August 6, 2007, (Dkt. Entry 299); and October 12, 2007.  (Dkt. Entry 313.)

Merits discovery has been stayed pending class certification.  On August 27, 2007, Plaintiffs moved to amend Pre-Trial Order No. 1 so as to allow some merits discovery while the class certification motion remained pending.  (Dkt. Entry 300.)  That motion will now be dismissed as moot.

On September 18, 2007, Bemis and MACtac moved for dismissal of the Second Amended Complaint on the basis of Bell Atlantic Corp. v Twombly, 127 S. Ct. 1955 (2007), decided in May of 2007.  In October of 2007, Bemis and MACtac moved to stay any ruling on the class certification motion until after resolution of their motion to dismiss.  On November 7, 2007, this Court denied their request to stay disposition of the class certification motion pending a ruling on the motion to dismiss.  (Dkt. Entry 332.)  Oral argument on the motion to dismiss is scheduled for December 11, 2007.

> fact common to the class [("commonality")], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [("typicality")], and (4) the representative parties will fairly and adequately protect the interests of the class [("adequacy of representation")].

Fed. R. Civ. P. 23(a); In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 183 (D.N.J. 2003).

In addition to satisfying the Rule 23(a) prerequisites, an action may be maintained as a class action only if it falls within one of the three types of class actions authorized by Rule 23(b).

Plaintiffs seek to maintain a class action under Rule 23(b)(3), which provides:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs, as the moving parties, have the burden to show that the Rule 23(a) and (b)(3) requirements are met.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997). Although only the predominance requirement of Rule 23(b)(3) is disputed by the parties, the Court must independently find satisfaction of the Rule 23(a) and (b)(3) requirements.

The Court may certify a class action only if it "is satisfied, after a rigorous analysis, that the [requirements of Rule 23] have been satisfied."  Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982).  The Court in Falcon observed that a class certification motion

"'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  Id. at 160 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978)).  Furthermore, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  Id.

The Third Circuit's approach to class certification is consistent with Falcon.  "'Before deciding whether to allow a case to proceed as a class action, . . . [courts] should make whatever factual and legal inquiries are necessary under Rule 23.'"  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001) (quoting Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001)).  "[A] preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."  Id. at 168.  This rigorous analysis, however, does not require – or authorize – the Court to credit Plaintiffs' evidence over Defendants' or vice versa.  "[A]t the class certification stage, 'the Court need not concern itself with whether Plaintiffs can prove their allegations . . .; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law.'"  In re Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002) (quoting Lumco Indus., Inc. v. Jeld-Wen, Inc., 171 F.R.D. 168, 173-74 (E.D. Pa. 1997)).  Indeed, our Court of Appeals has held that the "'interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing the class action.'"  Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) (quoting

Kahan v. Rosenstiel, 424 F.2d 161, 169 (3d Cir. 1970)).

Plaintiffs and Defendants both offer expert affidavits from their respective economists, and Defendants challenge vehemently the analysis of Plaintiffs' economist, Dr. Beyer.  "To the extent that [class certification] involves a battle of experts, it [is] not appropriate for the Court to determine which expert is more credible at this time." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001).  To be sure, however, a court will not "grant class certification on fanciful or improbable suppositions." In re Mercedes-Benz, 213 F.R.D. at 190. That is, the Court will consider each opinion of the experts, unless it is shown that the "'opinion is the kind of "junk science" that a Daubert inquiry at this preliminary stage ought to screen.'" In re Linerboard, 203 F.R.D. at 217 n.13 (quoting In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 78 (E.D.N.Y. 2000)).

Defendants argue that this Court must resolve factual disputes pertinent to class certification, particularly factual issues that concern the requirement that questions of law or fact common to class members predominate over questions affecting only individual class members.  This argument is directed at Dr. Beyer, as Defendants dispute the factual basis of Dr. Beyer's economic analysis.  In this regard, Defendants rely heavily on the analysis presented in In re Initial Public Offering Securities Litigation, 471 F.3d 24 (2d Cir. 2006).

In In re Initial Public Offering, the district court certified a class action in a securities fraud case where the plaintiff-investors alleged a scheme to defraud in connection with the

15

issuance of securities in the initial public offering market.  On appeal, the Second Circuit

clarified its standards for class certification.  Among other things, the court stated:

"determinations [regarding the Rule 23 requirements] can be made only if the judge resolves

factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts

are relevant to a particular Rule 23 requirement have been established."  Id. at 41.  The court

added, "the obligation to make such determinations is not lessened by overlap between a Rule

23 requirement and a merits issue."  Id.  Applying these standards, the Second Circuit reversed

the district court's decision.

In a securities fraud case, a plaintiff must show, among other things, he or she relied on

the misrepresentation.  Reliance is generally an individual question that will defeat class

certification unless plaintiffs show the applicability of the presumption of reliance, known as the

"fraud-on-the-market doctrine."  Id. at 42 (citing Basic Inc. v. Levinson, 485 U.S. 224, 245-47

(1988)).  For the presumption to apply, the plaintiffs must show that the securities at issue

traded in an efficient market.  The Second Circuit observed that, as a general rule, the market

for an initial public offering is not efficient.  Id.  Concluding that "the Plaintiffs' own allegations

and evidence demonstrate that an efficient market cannot be established in this case," the

Second Circuit held that the predominance requirement could not be met.  Id.

In this matter, Defendants dispute the factual basis of Dr. Beyer's economic analysis of

the PSL industry and contend, citing In re Initial Public Offering, that this Court must resolve

these factual disputes.  The Court disagrees.  First, to the extent In re Initial Public Offering can

be read to require resolution of disputes of fact where the dispute concerns a merits issue, this

Court is bound to follow Third Circuit precedent.  See In re Hydrogen Peroxide Antitrust Litig.,

240 F.R.D. 163, 170 n.6 (E.D. Pa. 2007) (suggesting In re Initial Public Offering imposes a

higher burden than that applied by the Third Circuit in In re Linerboard).  Second, this Court is

not convinced that In re Initial Public Offering approves the fact finding envisioned by

Defendants.  In this regard, the court in In re Initial Public Offering sought to align the Second

Circuit with other circuits, and quoted approvingly the Third Circuit's decision in Newton.  See In

re Initial Public Offering, 471 F.3d at 38 (quoting Newton, 259 F.3d at 166).  While Newton

allows an inquiry into the factual and legal issues of the plaintiffs' cause of action, it does not

authorize the mini-trial that would result were this Court to embrace Defendants' position.

Finally, Defendants fail to cite a single case in the antitrust context where the court resolved

factual disputes regarding an expert's economic analysis of a particular industry.  Moreover,

their contention runs contrary to Third Circuit precedent.  For example, in In re Linerboard, the

Third Circuit reviewed Dr. Beyer's economic analysis that was premised on the characteristics

of the linerboard and corrugated box industry.  Significantly, the court did not determine

whether Dr. Beyer's conclusions were correct.  See In re Linerboard, 305 F.3d at 153-54.

Instead, the court simply "'assure[d] itself that Plaintiffs' attempt to prove their allegations will

predominantly involve common issues of fact and law.'"  Id. at 152 (quoting Lumco Indus., 171

F.R.D. at 174); see also In re Linerboard, 203 F.R.D. at 220 (declining to resolve defendants'

challenge to Dr. Beyer's economic analysis, and instead determining whether the plaintiffs'

allegations involve generalized proof common to all class members).

Recent district court decisions in the antitrust context continue to subscribe to the view

that "it is not necessary at the class certification stage for the Plaintiffs to establish the merits of

their case." Behrend v. Comcast Corp., Civ. A. No. 03-6604, 2007 WL 1300725, at *17 (E.D.

Pa. May 2, 2007).  Accord In re OSB Antitrust Litig., No. 06-826, 2007 WL 2253418, at *6 (E.D.

Pa. Aug. 3, 2007) ("I may reject Dr. Beyer's analysis only if it has no probative value . . . ."); In

re Polyester Staple Antitrust Litig., MDL No. 3:03CV1516, 2007 WL 2111380, at *13 (W.D.N.C.

July 19, 2007) ("The likelihood of the plaintiffs' success on the merits . . . is not relevant to the

issue of whether certification is proper." (internal quotations omitted)); In re Foundry Resins

Antitrust Litig., 242 F.R.D. 393, 410 (S.D. Ohio 2007) ("For purposes of class certification, this

Court need not entertain Defendants' arguments that essentially question whether [Dr. Beyer] is

correct in his assessment of these market characteristics . . . .  Rather, this is for the trier of fact

to later decide.").  Accordingly, this Court will not render "findings of fact" with respect to the

characteristics of the PSL industry.  Instead, it will determine whether Plaintiffs have proffered

evidence of sufficient probative value to warrant certification of a class action.

### B. The Class Definition

Plaintiffs propose certification of the following class:

> All persons (excluding governmental entities, Defendants, co-conspirators, other producers of self-adhesive labelstock, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased self-adhesive labelstock in the United States directly from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1996 to July 25, 2003.

The proposed class covers those who purchased from Defendants all types of PSL products – paper, film, foil, and piggyback.  In opposing Plaintiffs' motion, Defendants argue that Avery's FasClear and PRIMAX film products are patented products and, therefore, could only be produced by Avery.  Plaintiffs concede these products should be excluded from the class, (see Pls.' Mem. Law Resp. Defs'. Sur-rebuttal, Dkt. Entry 282, at 7 n.20; Oral Argument Tr., Mar. 1, 2007, Dkt. Entry 295, at 12), and the class definition will be modified accordingly.

Moreover, this Court has reviewed the evidentiary record and finds it appropriate to further limit the class to purchasers of paper- and film-based PSL products.  First, the record reflects that paper- and film-based PSL account for approximately 98.5% of the PSL sold in the United States.  Second, the parties' arguments and experts' analyses are directed only to these two product types.  Beyond the background information regarding the PSL industry, there has been no further discussion about foil and piggyback PSL products.[4]  Indeed, one integral

---

[4]Dr. Beyer described piggyback labels as having "a unique five-layer construction," including "a face material, an adhesive, a base material, another adhesive layer, and an additional base material."  (Beyer Aff. ¶ 18 n.15.)  Foil labelstock has a metallic face material.

(continued...)

characteristic of the PSL industry that underlies Dr. Beyer's analysis is that PSL is an

undifferentiated, commodity-like product.  This characteristic, however, is limited to paper- and

film-based PSL products.  (See Beyer Aff. ¶ 20.)  Finally, Dr. Beyer proposed two methods for

calculating damages on a class-wide basis and stated he could use either method to perform

separate damage calculations for paper- and film-based PSL products.  There was no mention

of calculating damages for purchasers of foil and piggyback PSL products.

In modifying the class definition, the Court notes it is not bound by Plaintiffs' proposed

class definition and has broad discretion to redefine the class, whether upon motion or sua

sponte.  See Hohider v. United Parcel Serv., Inc., 243 F.R.D. 147, 209 (W.D. Pa. 2007);

Rendler v. Gambone Bros. Dev. Co., 182 F.R.D. 152, 160 (E.D. Pa. 1998).  Therefore, the

class to be considered for certification is as follows:

> All persons (excluding governmental entities, Defendants, co-
> conspirators, other producers of self-adhesive labelstock, and
> the present and former parents, predecessors, subsidiaries,
> and affiliates of the foregoing) who purchased paper-based
> self-adhesive labelstock or film-based self-adhesive labelstock
> in the United States directly from any of the Defendants, or any
> present or former parent, subsidiary, or affiliate thereof, at any
> time during the period from January 1, 1996, to July 25, 2003.
> The terms "paper-based self-adhesive labelstock" and "film-
> based self-adhesive labelstock" do not include Avery's
> FasClear and PRIMAX film products.  Nor do those terms
> include foil or "piggyback" self-adhesive labelstock.

---

[4](...continued)
(Id. ¶ 18.)  Together, foil and piggyback PSL account for 1% of the PSL market.  (Id.)

### C. **The Rule 23 Requirements**

#### 1) **The Rule 23(a) Prerequisites**

All class actions must satisfy the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  These prerequisites "assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances."  Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

##### a) **Numerosity**

Rule 23(a)(1) requires the class be "so numerous that joinder of all members is impracticable."  Plaintiffs need not show joinder is impossible; rather, "strong litigational hardship or inconvenience" suffices to demonstrate impracticality of joinder.  In re Flat Glass Antitrust Litig., 191 F.R.D.472, 477 (W.D. Pa. 1999).  In general, a class exceeding forty geographically dispersed members will satisfy the numerosity prerequisite.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001); In re Flat Glass, 191 F.R.D. at 477.

Here, Plaintiffs argue that Defendants sold PSL to over 3,000 customers nationwide. (Pls.' Mem. Law Supp. Mot. Class Certification ("Pls.' Supp. Mem."), Dkt. Entry 246, at 12 (citing Beyer Aff. ¶ 32).)  Defendants do not dispute this contention.  Joinder of this significant number of geographically dispersed class members would be impracticable.  Therefore, the numerosity prerequisite of Rule 23(a)(1) is satisfied.

##### b) **Commonality**

Rule 23(a)(2) requires "questions of law or fact common to the class."  In Baby Neal, 43 F.3d at 56, our Court of Appeals stated that the "commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Where, as here, the plaintiffs allege an antitrust conspiracy, the commonality prerequisite is invariably satisfied because the conspiracy is the central issue.  See In re Mercedes-Benz, 213 F.R.D. at 184-85.

Here, Plaintiffs identify several questions of fact and law common to the class, i.e., whether Defendants conspired to fix, raise, maintain, or stabilize prices of PSL sold in the United States; whether Defendants conspired to allocate the market for or restrict the output of PSL in the United States; the identities of the conspirators and the duration of the conspiracy; whether the alleged conspiracy violated Section 1 of the Sherman Act; and whether the alleged conspiracy injured Plaintiffs and the class.  (Second Am. Compl. ¶ 24.)  Defendants do not contest Plaintiffs' assertion of common questions of law and fact, and the Court finds that the commonality prerequisite of Rule 23(a)(2) is satisfied.

### c) Typicality

Rule 23(a)(3) requires "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  Baby Neal, 43 F.3d at 55.  Typicality is found

"where there is a strong similarity of legal theories, or where the claims of the representative plaintiffs and the rest of the class arise from the same alleged conduct by the defendants." In re Mercedes-Benz, 213 F.R.D. at 185.  Typicality is usually satisfied in a horizontal antitrust conspiracy case, even though a plaintiff may have purchased different product types or quantities or received different prices, or a plaintiff purchased from one defendant but not another.  See In re Bulk [Extruded] Graphite Prods. Antitrust Litig., No. Civ. 02-6030 (WHW), 2006 WL 891362, at *6 (D.N.J. Apr. 4, 2006); In re Vitamins Antitrust Litig., 209 F.R.D. 251, 260-61 (D.D.C. 2002).

Here, Plaintiffs contend their claims are typical of the claims of the putative class. Plaintiffs allege Defendants conspired to fix, raise, maintain, and stabilize prices, and to allocate the market for and restrict the output of, PSL sold in the United States, with the result being that all putative class members purchased PSL at artificially-inflated prices.  The claims of Plaintiffs and the putative class members present similar legal theories.  Defendants do not challenge Plaintiffs' contention of typicality, and the Court finds the typicality prerequisite of Rule 23(a)(3) is satisfied.

### d) Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This prerequisite consists of two prongs: (1) "the class representatives do not have interests antagonistic to the interests of the class"; and (2) "the

plaintiffs' attorney[s] [are] competent to conduct a class action." In re Linerboard, 203 F.R.D. at 207.  The class representatives' interests are antagonistic to the interests of the class only where there is a conflict of interest that is "'apparent, imminent, and on an issue at the very heart of the suit.'" In re Flat Glass, 191 F.R.D. at 482 (quoting In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 514 (S.D.N.Y. 1996)).  To determine whether Plaintiffs' attorneys are competent, the Court may consider counsel's experience in class actions and antitrust disputes and counsel's performance so far in this litigation.  See In re Microcrystalline Cellulose Antitrust Litig., 218 F.R.D. 79, 84 (E.D. Pa. 2003).

In this matter, Plaintiffs' interests are aligned with the interests of the class: Plaintiffs and the class members seek redress for the harm inflicted by Defendants' alleged horizontal antitrust conspiracy.  Defendants do not assert a conflict between Plaintiffs and the putative class members, and this Court's examination of the record has revealed none.  Moreover, Plaintiffs' counsel is competent to prosecute a class action, and Defendants do not claim otherwise.  Counsel have extensive experience litigating antitrust class actions, (see Exs. 23-26 to Bruckner Decl., Dkt. Entries 247-24 to 247-27 (firm biographies)), and have vigorously pursued this action so far.  Therefore, the Court finds the adequacy of representation prerequisite of Rule 23(a)(4) is satisfied.

## 2) The Rule 23(b)(3) Class Action Requirements

As mentioned above, Plaintiffs argue this action should be certified as a Rule 23(b)(3)

class action.  This Court may grant Plaintiffs' motion if it finds that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members,"(the "predominance" requirement), and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," (the "superiority" requirement).  Fed. R. Civ. P. 23(b)(3).[5]  The Court will address the predominance and superiority requirements in turn.

### a) Predominance

"Predominance measures whether the class is sufficiently cohesive to warrant certification."  Newton, 259 F.3d at 187 (citing Amchem Prods., 521 U.S. at 623).  The predominance requirement is "significantly more demanding" than the commonality prerequisite of Rule 23(a)(2).  Id.  While commonality is satisfied by a single question common to the class, "[p]redominance requires that the common issues be both numerically and qualitatively substantial in relation to" the individual questions.  In re Mercedes-Benz, 213 F.R.D. at 186.

---

[5]Rule 23(b)(3) continues:

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Nevertheless, "[t]he mere existence of individual issues will not of itself defeat class certification." Id.  To satisfy the predominance requirement, Plaintiffs must show "'there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position.'" In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *9 (quoting In re Vitamins, 209 F.R.D. at 262).

To prevail at trial, Plaintiffs must prove three elements: (1) Defendants violated federal antitrust law, here Section 1 of the Sherman Act; (2) the fact of damage, also known as impact, from Defendants' unlawful activity; and (3) the amount of damages caused by the unlawful activity.  In re Linerboard, 203 F.R.D. at 214.  Additionally, Plaintiffs will need to prove Defendants' fraudulent concealment of the alleged conspiracy in order to toll the four-year statute of limitations and recover for the entire class period.

### i. Antitrust Violation

"Common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members."  In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *9.  In this regard, courts consistently hold that proof of the existence and scope of an antitrust conspiracy entails common proof because the inquiry necessarily focuses on the defendants' conduct.  See, e.g., id.; In re Flat Glass, 191 F.R.D. at 484.  Furthermore, some courts and commentators suggest that "'whether a conspiracy exists is a common question that

is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3).'" In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *9 (quoting 7AA Charles Alan Miller et al., Federal Practice & Procedure § 1781, at 228 (3d ed. 2005)); see also In re Carbon Black Antitrust Litig., No. Civ. A. 03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *15 (D. Mass. Jan. 18, 2005).

Section 1 of the Sherman Act, in part, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  In this matter, Plaintiffs allege Defendants conspired to "fix, raise, maintain or stabilize prices for self-adhesive labelstock . . . and to allocate and restrict output in the market for self-adhesive labelstock sold in the United States."[6]  (Second Am. Compl.¶ 1.)  To establish liability, Plaintiffs and the class members will have to prove that Defendants conspired to fix prices, allocate the market, and restrict the output for PSL sold in the United States.[7]  Liability will thus focus on Defendants'

---

[6]The Supreme Court has held that horizontal agreements – which are agreements among competitors – to fix prices and to divide markets or allocate customers are per se violations of Section 1 of the Sherman Act.  See, e.g., Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49 (1990) (per curiam); United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972); United States v. Trenton Potteries Co., 273 U.S. 392, 397-98 (1927).

[7]At oral argument, Defendants argued that the paper supply agreement between Avery and UPM is not a horizontal agreement.  Rather, they maintain the agreement was a vertical, dual distribution agreement, and that liability can be established only by considering a "host of individualized issues" under the rule of reason.  (Oral Argument Tr. 65, 67.)  See Elecs. Commc'ns. Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 243 (2d Cir. 1997)

(continued...)

conduct.

To illustrate this point, Plaintiffs point to internal documents from Defendants probative of conspiratorial behavior.  These documents will be utilized by all class members to establish Defendants violated federal antitrust law.  That Plaintiffs allege various aspects of the conspiracy – market allocation during the early period of the conspiracy followed by market allocation and price fixing in the latter period – does not alter the common question, "namely, whether [D]efendants acted in concert to decrease competition among themselves." In re Flat Glass, 191 F.R.D. at 485.  Accordingly, common questions predominate over individual questions with respect to whether Defendants violated antitrust law.

### ii. Antitrust Impact

The critical issue presented by Plaintiffs' class certification motion is whether common questions predominate with respect to antitrust impact.  Plaintiffs argue they have satisfied their burden on this issue in two ways.  First, Plaintiffs contend that their allegations of horizontal

---

[7](...continued)
(dual distribution agreements are vertical restraints analyzed under the rule of reason); see also id. at 244 (under rule of reason analysis, an agreement violates federal antitrust law if it has "an actual adverse effect on competition in the relevant market").  This argument is meritless.  A dual distribution arrangement is one "[w]here a manufacturer or trademark licensor uses independent distributors and itself operates as a distributor in actual or potential competition with its independent distributors."  ABA Section of Antitrust Law, Antitrust Law Developments 160 (5th ed. 2002).  Here, UPM did not supply label papers to Avery for subsequent distribution.  Instead, Plaintiffs allege, Avery purchased paperstock from UPM in consideration for UPM/Raflatac's promise to refrain from competing in the United States PSL market.  As such, the agreement was between competitors and, therefore, horizontal.

price-fixing and market allocation create a presumption of common impact, known as the "Bogosian short-cut," named after Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977). (Pls.' Supp. Mem. 19, 20.)  Second, Plaintiffs argue that the economic analysis of their expert, Dr. Beyer, demonstrates that impact can be proven classwide with common evidence.  (Id. at 19, 21-23.)  Defendants counter that Plaintiffs cannot show common proof of impact because Plaintiffs are not entitled to a presumption of impact, and Dr. Beyer's economic analysis does not reflect the realities of the PSL industry.

Antitrust impact, or the fact of damage, requires "'proof of some damage flowing from the unlawful conspiracy.'"  In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *10 (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969)); see also Rossi v. Standard Roofing, Inc., 156 F.3d 452, 483 (3d Cir. 1998).  The Court's concern at this stage is not whether Plaintiffs can or will establish class-wide impact, "but whether class-wide impact may be proven by evidence common to all class members."  In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *10.  Plaintiffs are not required to show that they currently possess all of the common evidence to prove impact, but need "'only make a threshold showing that the element of impact will predominately involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class.'"  In re Linerboard, 203 F.R.D. at 220 (quoting Lumco Indus., 171 F.R.D. at 174).  "Whatever methodology is used, for impact to be proven on a class-wide basis, the common proof must adequately demonstrate

damage to each individual." In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *10.

In Bogosian, service station operators brought a class action against major oil companies alleging a conspiracy to tie gas station leases to purchases of gasoline. 561 F.2d at 439. The Third Circuit rejected the district court's categorical assumption that impact, or fact of damage, always requires individualized proof:

> [T]here is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

Id. at 454. The court noted that in cases involving the defendant's supply of goods at supra-competitive prices, impact could be shown with common proof. Id. at 455. The court concluded with a statement viewed as the genesis of the so-called "Bogosian short-cut":

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

Id.

Courts considering class certification motions have relied on this language to presume class-wide impact based upon the nature of the plaintiffs' allegations.  For instance, where plaintiffs allege the defendants conspired to fix prices for certain goods at an artificially high level, the "logic of the circumstances" suggests that anyone who purchased these goods during the period of the alleged conspiracy would be injured.  See In re Mercedes-Benz, 213 F.R.D. at 189 (conspiracy among automobile dealers to fix the price of luxury cars).  The Third Circuit reaffirmed the continuing vitality of Bogosian in a case involving supply manipulation.  See In re Linerboard, 305 F.3d at 152-53.

Here, Plaintiffs allege Defendants conspired to allocate the market for and restrict the supply of PSL in the United States.  They point to an alleged understanding among Defendants not to compete for each other's customers and the agreement between Avery and UPM to exclude Raflatac from the United States market.  Plaintiffs further allege that, after Raflatac's entry into the United States market and consequent market-wide decrease in PSL prices, Defendants agreed to halt the downward slide in prices.  Plaintiffs argue that if they prove these allegations, basic economics suggest that the class members would have paid higher prices for PSL than in the absence of the alleged unlawful activity.

Defendants argue Bogosian is inapplicable because, among other reasons, PSL is a differentiated product and the alleged conspiracy involved different actions over distinct periods. Because the economic analysis of Dr. Beyer suffices to show common proof of impact on a

class wide basis, it is unnecessary to decide whether the <u>Bogosian</u> short-cut applies here.[8]

Dr. Beyer analyzed the structural characteristics of the PSL industry to determine "whether there is generalized proof that there would have been adverse economic impact on the proposed Class as a result of the alleged cooperative behavior." (Beyer Aff. ¶ 7; <u>see also</u> <u>id.</u> ¶¶ 12-46 (background section discussing PSL, Defendants, and the PSL market).) Dr. Beyer found that paper- and film-based PSL are undifferentiated, or commodity-like, products. (<u>Id.</u> ¶ 20, 48.) When products are undifferentiated or commodity-like, "one manufacturer's output can be easily substituted for that of another manufacturer." (<u>Id.</u> ¶ 48.) As confirmation of the substitutability of PSL across Defendants, Dr. Beyer reviewed Defendants' "product crosswalks," which "are listings of products (or characteristics of products) of different suppliers that are deemed to [be] substitutable for one another." (<u>Id.</u> ¶ 26.) Because PSL products are undifferentiated, purchasing decisions are guided primarily by price, and competing manufacturers will compete on the basis of price. (<u>Id.</u> ¶¶ 20, 48.) Dr. Beyer concluded, therefore, that in the absence of a conspiracy all class members would have benefited from more active price competition. (<u>Id.</u> ¶ 48.)

---

[8]It is worth noting that courts applying the <u>Bogosian</u> short-cut ordinarily do not rest their decision to certify a class strictly on this presumption. Instead, they routinely assess the plaintiffs' economic analysis of the industry at issue, either as an alternative to the presumption or as a justification for its application. <u>See, e.g.</u>, <u>In re Linerboard, 305 F.3d at 153-55</u>; <u>In re Polyester Staple</u>, <u>2007 WL 2111380</u>, at *20-23; <u>In re Microcrystalline Cellulose, 218 F.R.D. at 89-92</u>; <u>In re Mercedes-Benz, 213 F.R.D. at 189-91</u>.

Dr. Beyer examined the supply-side of the PSL industry.  He found that Defendants participate in multiple PSL product categories.  In 2003, Avery, MACtac, and Raflatac sold all but one of the 15 TLMI product categories, and throughout the class period each Defendant sold most categories of PSL or had the ability to do so.  (Id. ¶¶ 23, 56.)  Defendants sold PSL products throughout the United States, preventing any one Defendant from dominating a particular region.  (Id. ¶¶ 45, 58.)  Finally, during the class period the PSL industry operated in a state of excess capacity.  (Id. ¶¶ 38, 60.)  Given these characteristics, Dr. Beyer concluded that the absence of a conspiracy would have resulted in active competition among Defendants. (Id. ¶ 62.)

Dr. Beyer also noted that the class members could not have avoided the artificially-inflated prices of the alleged conspiracy.  First, the PSL industry is highly concentrated.  (Id. ¶¶ 33, 49.)  In 2003, Defendants controlled nearly 78% of the PSL market, and in 2002, they accounted for 63% of the North American production capacity.  (Id. ¶¶ 33, 50.)  "According to standard economic theory, companies in highly concentrated industries are better able to assert market power, and hence influence price, than companies in less concentrated industries."  (Id. ¶ 34 (citing Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 236-37 (3d ed. 2000).)  The Herfindahl-Hirschman Index, used by the Federal Trade Commission and Justice Department to measure market concentration, confirmed Dr. Beyer's observation that the PSL industry is highly concentrated.  (Id. ¶ 34.)  Second, entry by new competitors into the

PSL industry is limited because of the significant investment required by new firms, the excess capacity in the PSL industry, and the modest growth rates in the PSL industry.  (Id. ¶ 37-39, 52.)  Third, there were no viable economic substitutes for PSL during the class period that purchasers could switch to in the short-term to avoid higher PSL prices.  (Id. ¶ 42-43, 53.)  Based on these three characteristics, industry participants can maintain higher prices without the risk of lost sales to competitors or non-PSL producers.

Finally, Dr. Beyer found that PSL prices exhibited a pricing structure, suggesting prices are impacted by similar forces.  (Id. ¶ 63.)  He examined sales transaction data provided by Defendants.  (Id.)  He graphed prices charged by Defendants for different PSL products to show that PSL prices moved together over time.  (Id. ¶¶ 65, 67-69; see also id. (Charts 2a-2c, 3a-3c).)

Dr. Beyer concluded that these four aspects of the PSL industry – a commodity-like product, participation of all Defendants in all product categories, inability to avoid artificially-inflated prices, and pricing structure – "constitute common proof of impact across all Class members if there were cooperative behavior as alleged" by Plaintiffs.  (Id. ¶ 47.)  Courts have accepted this type of economic analysis in determining common proof of impact will predominate over individual issues.  See, e.g., In re Linerboard, 305 F.3d at 153-54; In re Foundry Resins, 242 F.R.D. at 409-10 ; In re Hydrogen Peroxide, 240 F.R.D. at 172-73; In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *12-13; In re Carbon Black, 2005 WL

102966, at *15 & n.18; In re Mercedes-Benz, 213 F.R.D. at 189-90.

Defendants argue that Dr. Beyer's economic analysis is not rooted in the realities of the PSL industry.  They offer the affidavits of Dr. Joskow to refute Dr. Beyer's analysis and to show that questions pertaining to any impact on individual class members resulting from the alleged anticompetitive conduct will predominate.

Significantly, Defendants do not contend that Dr. Beyer's methodology is invalid.  Rather, they complain that his analysis does not apply to their industry.

What is apparent to this Court is that Drs. Beyer and Joskow have examined the PSL industry and have reached different conclusions about the feasibility of common proof of impact.  The parties have presented a classic "battle of the experts," which need not and will not be resolved at the class certification stage.  It suffices at this point that there is a factual basis for Dr. Beyer's analysis.  Therefore, Defendants' arguments must be rejected.

Defendants contend that PSL is not an undifferentiated, commodity-like product.  (See Defs.' Mem. Law Opp'n to Mot. Class Certification ("Defs.' Opp'n Mem."), Dkt. Entry 254, at 13-18.)  Defendants argue they produce a "dizzying array" of products, including specialty products, such that one Defendant's output cannot be readily substituted for another's.

This argument fails for at least two reasons.  First, Defendants' internal documents (i.e., product crosswalks and transaction data showing that a small number of products account for large percentage of sales), and Plaintiffs' deposition testimony (i.e., most products can be

purchased from all manufacturers, price is the primary consideration in purchasing decisions)

support Dr. Beyer's conclusion that PSL is an undifferentiated, commodity-like product.

Further, Bemis, MACtac, UPM, and Raflatac took the position in the DOJ Merger Litigation that

both supply and demand substitution existed in the PSL industry.  (See Ex. 3 to Richards Decl.,

Dkt. Entry 265-4, at 8.)  Second, courts have certified class actions where the products were as

diverse, if not more diverse, than PSL; product diversity does not render common proof of

impact impossible.  See, e.g., In re Rubber Chems. Antitrust Litig., 232 F.R.D. 346, 349, 352

(N.D. Cal. 2005); In re Vitamins, 209 F.R.D. at 254-55; In re Citric Acid Antitrust Litig., No. 95-

1092, C-95-2963 FMS, 1996 WL 655791, at *1, 6 (N.D. Cal. Oct. 2, 1996); In re Fine Paper

Antitrust Litig., 82 F.R.D. 143, 147, 152 n.10 (E.D. Pa. 1979).

Next, Defendants assail as "illusory" Dr. Beyer's statements regarding excess capacity

in the PSL industry.  (Defs.' Opp'n Mem.  27.)  They argue that technical limitations constrained

their ability to utilize their PSL-producing capacity to the fullest extent.  (Id. at 28.)  This

assertion appears to be inconsistent with the position taken in the DOJ Merger Litigation, during

which Defendants observed that "a supplier that manufactures some types of PSL can easily

add more product types without any additional fixed costs."  (Ex. 3 to Richards Decl., Dkt. Entry

265-4, at 8.)  Furthermore, Plaintiffs offer examples of Defendants' internal documents

recognizing the excess capacity throughout the PSL industry.  (See, e.g., Exs. 18-19, 21, 23 to

Richards Decl., Dkt. Entries 265-19 to 265-20, 265-22, 265-24.)  For example, a MACtac

forecast of business in April of 2001 reported that there was "significant manufacturing capacity surplus throughout the [industry] . . . ."  (Dkt. Entry 265-24, at 2.)  Thus, not only does Dr. Beyer propose a methodology of antitrust impact common to all class members, there is also a factual basis for his approach.

Defendants also claim that Dr. Beyer's "assumption" that Defendants could produce, or were capable of producing, all PSL products is not supported by the evidentiary record.  (Defs.' Opp'n Mem. 23.)  They claim the complexities of the coaters limited their ability to produce multiple types of PSL products and emphasize Raflatac's North Carolina plant could not produce film-based PSL or use hot melt adhesive.  (Id. at 24-25.)

For similar reasons, this argument is without merit.  Proof of Defendants' production capabilities will focus on Defendants, and Plaintiffs offer Defendants' internal documents and DOJ Merger Litigation documents that contradict Defendants' position.  (See Exs. 3-4, 9 to Richards Decl., Dkt. Entries 265-4, at 8; 265-5, at 3 (testimony that "everybody can manufacture these products"); 265-10.)  Furthermore, Avery thought Raflatac could manufacture film-based PSL and viewed Raflatac as its main competitor in the film-based PSL product segment.  (See Ex. 21 to Richards Decl., Dkt. Entry 265-22, at 2 ("From a manufacturing perspective, Raflatac has become our chief competition by far.").)  See also In re Microcrystalline Cellulose, 218 F.R.D. at 91 (documents showing defendant viewed its co-defendant as the "more viable competitor" relevant to show how defendant would have acted in

the absence of an unlawful conspiracy).  That Raflatac began regular production of film-based

PSL at its North Carolina plant after the class period "add[s] support to [P]laintiffs' assertion that

[Raflatac] was technically capable of manufacturing [film-based PSL] products."  Id. at 91 n.3.

Next, Defendants contend the existence of non-Defendant PSL manufacturers and non-

PSL substitutes undermine Dr. Beyer's assumption that class members could not have avoided

higher prices.  (Defs.' Opp'n Mem. 19.)  According to Defendants, "[w]hether some class

members could have avoided the effects of collusive behavior is highly relevant to class

certification."  (Id. (citing Newton, 259 F.3d at 180).)

In Newton, a securities class action, investors sought certification of a class in an action

alleging that broker-dealers breached their "duty to execute trades under the most 'favorable

terms reasonably available.'"  Newton, 259 F.3d at 162.  The investors complained that the

broker-dealers executed trades through the National Best Bid and Offer System ("NBBOS")

without investigating other alternatives to secure a better price.  Id.  Because the NBBOS

sometimes offered the best price, the court held that an individual inquiry into each transaction

would be necessary to determine the investor's economic loss, that the investors were not

entitled to a presumption of economic loss, and that individual questions predominated over

any common questions with respect to this element.  Id. at 180-81, 190.  Therefore, the court

affirmed the district court's denial of the investors' motion for class certification.

Defendants' reliance on Newton is misplaced.  In Newton, the broker-dealers had a duty

to execute trades for their investors at the best possible price.  Whether a better price could be

obtained for each trade was relevant to the element of economic loss, hence, the necessity to

examine the alternatives.  In this case, Plaintiffs have proffered ample evidence that non-PSL

products were not an adequate substitute.  The question here, therefore, is not whether the

class members could have obtained a better price by buying some alternative product.  The

question here is whether the class members purchased PSL from Defendants at artificially-

inflated prices.  Therefore, Defendants' argument that non-Defendant, non-PSL alternatives

were available may be relevant at trial, but it will not defeat Plaintiffs' class certification motion

in light of the evidence that non-PSL alternatives were not adequate substitutes.

Finally, Defendants argue that PSL products do not exhibit a price structure.  In this

regard, Defendants launch a two-prong attack.  First, they argue there is no pricing structure

because prices in the PSL industry are routinely negotiated.  (Defs.' Opp'n Mem. 31-33.)  The

evidentiary record, however, reveals that Defendants issued pricing guidelines that established

the baseline price for negotiations.  (See, e.g., Exs. 27 & 32 to Richards Decl., Dkt. Entries 265-

28 & 265-33.)  Thus, if Plaintiffs' allegations of a conspiracy are true, and it can be shown that

prices were higher than they should have been, then even customers who negotiated prices

would have been harmed because the starting point for negotiations was inflated artificially.

See Carbon Black, 2005 WL 102966, at *16 ("if the plaintiffs 'prov[e] that the alleged conspiracy

resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser

39

who negotiated an individual price suffered some injury'" (quoting In re Indus. Diamonds

Antitrust Litig., 167 F.R.D. 374, 383 (S.D.N.Y. 1996))); In re Vitamins, 209 F.R.D. at 266; In re

Linerboard, 203 F.R.D. at 219; .

Second, Defendants argue Dr. Beyer's pricing structure analysis was not premised upon

a scientifically acceptable method.  (Defs.' Opp'n Mem. 29.)  They note that Dr. Joskow

performed a correlation analysis of the transaction data used by Dr. Beyer.  Dr. Joskow found

that one-third of the resulting correlation coefficients were equal to zero or less than zero, which

indicates the lack of similar price movements and that prices actually moved in opposite

directions.  (Id. at 30 (citing Joskow Aff., Dk. Entry 255, ¶ 73).)  In Dr. Beyer's reply affidavit, he

explained that the visual inspection of price charts over time is the first step in analyzing data.

(Beyer Reply Aff., Dkt. Entry 263, ¶ 38.)  He stated he did not use correlation analysis because

he "believe[d] it is readily apparent from inspecting [the price] charts that these prices are

moving similarly over time.  Statistical correlations would not add to this understanding."  (Id. ¶

39.)  He identified flaws in Dr. Joskow's correlation analysis and conducted his own analysis.

(Id. ¶¶ 40-48.)  At this stage, the Court does not have to select one expert's opinion over

another regarding the existence of pricing structure.  The Court has reviewed Drs. Beyer's and

Joskow's expert affidavits, and cannot conclude that Dr. Beyer's opinion regarding pricing

structure "'is the kind of "junk science" that a Daubert inquiry at this preliminary stage ought to

screen.'"  In re Linerboard, 203 F.R.D. at 217 n.13 (quoting In re Visa Check/Mastermoney ,

192 F.R.D. at 78).

In summary, the Court finds that Dr. Beyer's economic analysis is a plausible method of showing class-wide impact, and his approach is grounded in evidence of record.  Furthermore, proof of the industry characteristics underlying his analysis will primarily focus on Defendants, their production capabilities, and their products, and this predominates over any individual issues.  Therefore, the Court finds that common questions will predominate over individual questions with respect to antitrust impact.

### iii. Antitrust Damages

As with the fact of antitrust injury, Plaintiffs must sustain their burden to show a feasible method to calculate damages on a class-wide basis.  It is generally recognized that "'some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established.'"  Linerboard, 203 F.R.D. at 220 (quoting In re Flat Glass, 191 F.R.D. at 487).  In this regard, then-Justice Rehnquist observed that  "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted."  J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566-67 (1981) (quoting Hetzel v. Baltimore & Ohio R.R. Co., 169 U.S. 26, 39 (1898)).

In determining whether a feasible method exists to compute class-wide damages, the Court is mindful that "'[n]o precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so

unsubstantial as to amount to no method at all.'"  Carbon Black, 2005 WL 102966, at *19

(quoting Paper Sys., Inc. v. Mitsubishi Corp., 193 F.R.D. 601, 615 (E.D. Wis. 2000)).

Additionally, "[a]lthough individual issues may arise in calculating damages, this fact does not

defeat class certification."  In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *15; see

also In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 817 (3d

Cir. 1995) ("Because separate proceedings can, if necessary, be held on individualized issues

such as damages . . ., such individual questions do not ordinarily preclude the use of the class

action device.").

Here, Dr. Beyer proposed two methods to compute damages on a class-wide basis:

benchmark and multiple regression analysis.  He stated he would perform separate damage

calculations for both paper-based and film-based PSL to account for cost and demand factors

unique to each product category.

Using the benchmark method, Dr. Beyer will calculate the overcharge, or the amount by

which prices were higher during the conspiracy.  (Beyer Aff. ¶ 71.)  The overcharge would be

calculated using the "before-during-after method," in which a benchmark is identified from a

time period where there was no conspiracy and is ascertained using data from before, after, or

both before and after the conspiracy.  (Id. ¶ 72.)  The difference in prices during the benchmark

and conspiracy periods is generally calculated as a percentage to represent the percentage

overcharge.  (Id.)

42

Dr. Beyer indicated that a multiple regression analysis can be utilized to control for production costs (i.e., inputs) and demand factors that influence the price.  (Id. ¶ 77.) Additionally, a "binary conspiracy variable" is used to account for factors not considered cost or demand variables in the multiple regression analysis.  (Id. ¶ 81.)  In response to Dr. Joskow's criticism that the damages formula would not account for unique product and customer characteristics of the transactions, Dr. Beyer suggested that a fixed effects model could be employed to account for product- and customer-specific variables.  (Beyer Reply Aff. ¶¶ 58-59.)

The damages methodologies proposed by Dr. Beyer – benchmark and multiple regression analysis – are acceptable methods to calculate antitrust damages.  See, e.g., Linerboard, 305 F.3d at 154-55; In re Hydrogen Peroxide, 240 F.R.D. at 175; In re Bulk [Extruded] Graphite Prods., 2006 WL 891362, at *15; In re Carbon Black, 2005 WL 102966, at *20; In re Vitamins, 209 F.R.D. at 268; see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1237-38, 1239-41 (3d Cir. 1993) (holding multiple regression analysis is admissible under Fed. R. Evid. 702, and under the circumstances of the case, the district court abused its discretion by excluding the evidence under Fed. R. Evid. 403); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 179, 182 (2d ed. 2000) (noting regression analysis is used frequently in cases alleging antitrust violations).

Defendants argue that Dr. Beyer's proposed multiple regression analysis is flawed

because it yields an average overcharge that could overcompensate certain class members. (Defs.' Surrebuttal Mem. of Law in Opp'n to Mot. for Class Certification, Dkt. Entry 275, at 9-13.)  This flaw, Defendants continue, stems in large part because Dr. Beyer's method does not account for "'product and customer heterogeneity reflected in the Defendants' transaction databases.'"  (Id. at 10, 12 (quoting Beyer Reply Aff. ¶ 59).)  This will not defeat Plaintiffs' class certification motion because Plaintiffs do not have to present a precise damages formula at this stage.

Moreover, a multiple regression analysis does not have to account for every conceivable variable, as long as it includes the relevant variables most likely to influence the price.  See In re Indus. Silicon Antitrust Litig., Nos. 95-2104, 95-1131, 96-2003, 96-2111, 96-2338, 1998 WL 1031507, at *3 (W.D. Pa. Oct. 13, 1998) (citing Bazemore v. Friday, 478 U.S. 385, 400 (1986)).  Dr. Beyer has proposed a fixed-effects multiple regression analysis to control for product and customer heterogeneity.  If discovery substantiates Defendants' concerns that individual issues connected to product and customer heterogeneity render Dr. Beyer's proposed method unworkable, they could seek to have this Court sever the damages phase from the question of liability.  See In re Gen. Motors Corp. Pick-up Truck Fuel Tank, 55 F.3d at 817; In re Carbon Black, 2005 WL 102966, at *20-21.

In summary, the benchmark and multiple regression methods for assessing damages proffered by Plaintiffs are not so insubstantial as to amount to no method at all.  Therefore, the

Court finds that common questions will predominate over individual questions with respect to antitrust damages.

### iv. Fraudulent Concealment

Plaintiffs commenced these lawsuits in the wake of the Justice Department's April, 2003, announcement that its investigation into UPM's proposed acquisition of MACtac revealed coordination within the PSL industry.  Plaintiffs seek to recover for the period of the alleged conspiracy that they claim began as early as 1996.  Civil actions to recover for violations of Section 1 of the Sherman Act must be brought within four years of the accrual of the cause of action.  15 U.S.C. § 15b.  Plaintiffs claim Defendants fraudulently concealed the conspiracy, and therefore, the statute of limitations is tolled.[9]  Furthermore, they argue that common questions will predominate over individual questions with respect to fraudulent concealment.

"[I]t is well established that the doctrine of fraudulent concealment tolls the limitation period when a plaintiff's cause of action has been obscured by the defendant's conduct."  In re Linerboard, 305 F.3d at 160.  In In re Linerboard, the Third Circuit acknowledged that the doctrine of fraudulent concealment blends common and individual questions.  Id. at 160-61.[10]

---

[9]In an earlier Memorandum and Order, the Court held that Plaintiffs alleged a self-concealing conspiracy.  In re Pressure Sensitive Labelstock, 2006 WL 433891, at *4.

[10]The fraudulent concealment doctrine applies if the plaintiff establishes three elements: (1) fraudulent concealment; (2) plaintiff's failure to discover his claim; and (3) plaintiff's failure to discover occurred despite his due diligence.  In re Linerboard, 305 F.3d at 160.  Element one is considered a common question, while elements two and three usually present individual
(continued...)

45

The court, however, held that common issues surrounding fraudulent concealment will predominate.  "Notwithstanding the individual determinations that will undoubtedly arise at trial, common issues of concealment predominate here because 'the inquiry necessarily focuses on defendants' conduct, that is, what defendants did, rather than what plaintiffs did.'"  Id. at 163 (quoting In re Flat Glass, 191 F.R.D. at 488).  The analysis will focus on the defendants' acts to obscure and cover up the conspiracy, which will entail common proof.  Id.  Moreover, individual issues "may be adjudicated in the same fashion and at the same time as individual damages issues."  Id.

Here, Plaintiffs allege that Defendants concealed their conspiracy and that Plaintiffs, in spite of their due diligence, had no reason to suspect an antitrust conspiracy until the Justice Department's announcement in April, 2003.  Whether Defendants concealed their unlawful conspiracy will require common proof, i.e., evidence of Defendants' conduct.  And individual issues concerning Plaintiffs' and class members' discovery and due diligence can be litigated at the damages phase of this proceeding.  Therefore, the Court finds that common questions will predominate over individual questions with respect to fraudulent concealment.

### b) Superiority

Plaintiffs must show that "a class action is superior to other available methods for the fair

---

[10](...continued)
questions.  Id. (quoting In re Flat Glass, 191 F.R.D. at 487).

and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  In this regard, the Court

must "balance, in terms of fairness and efficiency, the merits of a class action against those of

'alternative available methods' of adjudication."  Georgine v. Amchem Prods., Inc., 83 F.3d 610,

632 (3d Cir.1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

First, the Court finds that a class action is the fairest way to adjudicate this controversy.

The cost to most class members to prosecute individual claims against Defendants would be

disproportionately large relative to the amount of damages claimed by each class member.

Most class members, therefore, would be deterred from bringing individual actions to redress

the harm caused by Defendants' alleged unlawful conduct.  See In re Linerboard, 203 F.R.D. at

223.

Second, a class action will be neither inefficient nor unmanageable.  Plaintiffs have

presented common questions of law and fact regarding whether Defendants violated federal

antitrust law, whether they are liable therefor, and whether Defendants concealed their alleged

conspiracy.  Individual questions of damages and the fraudulent concealment elements of

discovery and due diligence will not render the class action unmanageable.  Additionally,

resolving the common questions in a single judicial forum is the most efficient use of judicial

and litigant resources.  Therefore, the Court finds Plaintiffs have satisfied the superiority

requirement of Rule 23(b)(3).

### D. Appointment of Class Counsel Under Rule 23(g)

Plaintiffs request this Court appoint as Class Counsel the following firms: Trujillo Rodriguez & Richards, L.L.C.; Lockridge Grindal Nauen P.L.L.P.; Cohen Milstein Hausfeld & Toll, P.L.L.C.; and Keating Muething & Klekamp., P.L.L. ("Co-Lead Counsel").[11]  Plaintiffs also ask the Court to continue the appointment of O'Malley & Langan, P.C., as Liaison Counsel for the Plaintiff Class.

The Court is required to appoint class counsel when it certifies a class. Fed. R. Civ. P. 23(g)(1)(A); see also Fed. R. Civ. P. 23(g)(2)(B).  The Court must determine that class counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).  The Court must also consider four criteria in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) counsel's experience litigating class actions in general and antitrust claims in particular,  (3) "counsel's knowledge of the applicable law," and (4) "the resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(C)(i).  Consideration of these factors compels granting Plaintiffs' request.

First, Co-Lead Counsel worked extensively to investigate and identify the class claims. Among other things, counsel have coordinated efforts to obtain, review, and analyze the voluminous discovery completed thus far; hired experts and consultants; briefed and argued motions; and participated in all conferences.  (See Richards Decl. Supp. Pls.' Mot. Class

---

[11]The Court previously appointed these firms interim co-lead counsel.  (See Order of Court, Dec. 17, 2003, Dkt. Entry 31.)

Certification, Dkt. Entry 245 (summarizing counsel's efforts).)  Second, Co-Lead Counsel are experienced in litigating antitrust class actions and have represented plaintiff classes in several high-profile and complex cases.  (<u>See</u> Exs. 23-26 to Bruckner Decl., Dkt. Entries 247-24 to 247-27 (firm biographies).)  Third, Co-Lead Counsel are well-versed in antitrust law and have demonstrated their knowledge throughout the course of these proceedings.  Fourth, Co-Lead Counsel have adequate resources to prosecute vigorously the class claims.  Finally, the Court has observed Co-Lead Counsel's performance thus far, and is convinced they will fairly and adequately represent the interests of the class.  Accordingly, the Court will appoint them Class Counsel and will continue the appointment of O'Malley & Langan, P.C., as Liaison Counsel for the Plaintiff Class.

## III. <u>CONCLUSION</u>

For the reasons stated, the Court will grant Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

Dated:  November 19, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PRESSURE SENSITIVE** | : | |
| **LABELSTOCK ANTITRUST** | : | |
| **LITIGATION** | : | **MDL Docket No. 1556** |
| | : | **(No. 3:03-MDL-1556)** |
| | : | **(All Cases)** |
| | : | |
| | : | **(JUDGE VANASKIE)** |
| | : | |

<u>**ORDER**</u>

**NOW, THIS 19th DAY OF NOVEMBER, 2007**, for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

    1.  Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (Dkt. Entry

244) is **GRANTED.**

    2.  The Court certifies the following Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

> All persons (excluding governmental entities, Defendants, co-
> conspirators, other producers of self-adhesive labelstock, and
> the present and former parents, predecessors, subsidiaries,
> and affiliates of the foregoing) who purchased paper-based
> self-adhesive labelstock or film-based self-adhesive labelstock
> in the United States directly from any of the Defendants, or any
> present or former parent, subsidiary, or affiliate thereof, at any
> time during the period from January 1, 1996, to July 25, 2003.
> The terms "paper-based self-adhesive labelstock" and "film-
> based self-adhesive labelstock" do not include Avery's
> FasClear and PRIMAX film products.  Nor do those terms
> include foil and "piggyback" self-adhesive labelstock.

    3.  Pursuant to Fed. R. Civ. P. 23(c)(1)(B), the Court identifies the following class

claims, issues, and defenses:

a) Class claim:  The Class alleges a claim for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, during the Class Period of January 1, 1996, to July 25, 2003.

b) Class issues:

i) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize prices of self-adhesive labelstock sold in the United States;

ii) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate or restrict output in the market for self-adhesive labelstock in the United States;

iii) The identity of the participants in the conspiracy;

iv) The duration of the conspiracy alleged in Plaintiffs' Second Amended and Consolidated Class Action Complaint, (Dkt. Entry 190), and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

v) Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

vi) Whether the conduct of Defendants and their co-conspirators as alleged in Plaintiffs' Second Amended and Consolidated Class Action Complaint, (Dkt. Entry 190), caused injury to the business and property of Plaintiffs and other members of the class;

vii) The effect of Defendants' conspiracy on the prices of self-adhesive labelstock sold in the United States during the class period;

viii) The appropriate measure of damages sustained by Plaintiffs and other members of the class; and

ix) Whether Defendants fraudulently concealed the alleged conspiracy.

2

c) Class defense: Defendants allege that the claims of Plaintiffs and other members of the class are barred in whole or in part by the four-year statute of limitations, 15 U.S.C. § 15a.

4. The following Plaintiffs are appointed class representatives:

a) Scranton Label, Inc.;

b) Bertek Systems, Inc.;

c) McCarty Printing Corporation;

d) Glenroy, Inc.; and

e) Pamco Tape & Label, Inc.

5. The following law firms are appointed Class Counsel:

a) Trujillo Rodriguez & Richards, L.L.C.;

b) Lockridge Grindal Nauen P.L.L.P.;

c) Cohen Milstein Hausfeld & Toll, P.L.L.C.; and

d) Keating Muething & Klekamp., P.L.L.

6. The law firm of  O'Malley & Langan, P.C., shall continue as Liaison Counsel for the Plaintiff Class.

7. Defendants shall produce to Plaintiffs, no later than **December 17, 2007**, all customer lists or other information sufficient to provide Class Counsel the names and current or last-known mailing addresses of all persons who purchased paper-based self-adhesive labelstock or film-based self-adhesive labelstock, other than Defendant Avery's

3

FasClear and PRIMAX film products and foil and piggyback self-adhesive labelstock, from

any Defendant, or any present or former parent, subsidiary, or affiliate thereof, at any time

during the class period of January 1, 1996, to July 25, 2003.  The term "person" includes,

but is not limited to, individuals, corporations, partnerships, and unincorporated

associations, but excludes those persons or entities excluded from the Class definition.

8. On or before **December 31, 2007**, Class Counsel shall propose the method and

form of notice to the Class that provides the best notice practicable under the

circumstances, consistent with Fed. R. Civ. P. 23(c)(2)(B), including individual notice to all

members who can be identified through reasonable effort, and a schedule for providing

such notice.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

4