IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE: PRESSURE SENSITIVE        :
LABELSTOCK ANTITRUST             :
LITIGATION                       :        MDL Docket No. 1556
                                 :        (No. 3:03-MDL-1556)
                                 :        (All Cases)
                                 :
                                 :        (JUDGE VANASKIE)
                                 :

MEMORANDUM

On May 21, 2007, the Supreme Court decided Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007), in which it considered "what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act."[1]  Relying on Twombly, Defendants Morgan Adhesives Company ("MACtac"), a producer of pressure sensitive labelstock ("PSL"), and Bemis Company, Inc. ("Bemis"), the parent of MACtac, have moved to dismiss the claims asserted against them in Plaintiffs' Second Amended and Consolidated Class Action Complaint ("Second Amended Complaint").  (Dkt. Entry 304.)[2]  Although this Court denied MACtac's and Bemis's

---

[1]For the convenience of the reader of this decision in electronic format, hyperlinks to authority and to documents in this Court's electronic record have been inserted.

[2]Although styled a motion to dismiss filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Bemis's and MACtac's motion will be treated as a motion for judgment on the pleadings under Rule 12(c) since they answered the Second Amended Complaint and the pleadings are closed.  Regardless of the designated part of Rule 12, the standards applicable to resolving motions under Rule 12(b)(6) and Rule 12(c) are identical.  See Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991); Mikola v. Penn Lyon Homes, Inc., No. 4:CV-07-0612, 2008 WL 2357688, at *1 (M.D. Pa. June 4, 2008).

motion to dismiss the Amended Consolidated Class Action Complaint ("Amended Complaint"), which contained allegations against them essentially identical to those set forth in the Second Amended Complaint, MACtac and Bemis contend that the Court applied "then-applicable, now-overruled precedent" when it denied their motion.  Because Twombly raised the bar for pleading antitrust conspiracy claims, they argue, Plaintiffs' allegations cannot withstand scrutiny under this new standard.  Having carefully considered the parties' arguments in the context of Twombly, I find that the Second Amended Complaint contains enough fact to "plausibly suggest" MACtac was a willing participant in an unlawful conspiracy to restrain trade, but that a cognizable antitrust conspiracy claim has not been presented against Bemis.  Accordingly, the motion to dismiss will be granted as to Bemis, but denied as to MACtac.[3]

I. BACKGROUND

This class action arises from allegations of anti-competitive behavior in the United States PSL industry.  After eleven separate antitrust actions were consolidated for pretrial purposes in this Court by the Judicial Panel for Multi-District Litigation, see In re Pressure Sensitive Labelstock Antitrust Litig., 290 F. Supp. 2d 1374, 1376 (J.P.M.L. 2003), Plaintiffs filed an Amended Complaint on February 16, 2004.  (Dkt. Entry 46.)  In addition to MACtac and Bemis, named as Defendants were Avery Dennison Corporation ("Avery"), the largest producer

---

[3]This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15(a).

of PSL in the United States; Raflatac, Inc., the second largest PSL producer in the United States; and Raflatac's parent UPM-Kymmene ("UPM"), a Finnish corporation and a major producer of various types of paper used to produce PSL.

Among other things, the Amended Complaint alleged that, prior to UPM's expansion into the North American market, MACtac and Avery had elected not to compete for customers. MACtac's decision to refrain from competing with Avery, Plaintiffs alleged, was contrary to its economic self-interest in light of newly developed and considerable excess production capacity. As a consequence of this forbearance, MACtac's and Avery's respective market shares, as well as PSL prices, remained relatively stable. Additionally, Plaintiffs alleged that prices for PSL were set at supra-competitive levels, as evidenced by UPM's entry into the U.S. market despite the existence of considerable excess capacity and its ability (through Raflatac) to undercut prices by ten percent or more.

UPM/Raflatac's goal was to acquire twenty percent of the U.S. market. To prevent further price erosion, Avery held meetings with UPM to discuss easing price competition between them. The producers reached an understanding that UPM would acquire MACtac, which would enable it to attain its goal of a twenty percent market share without having to compete with Avery. Bemis agreed to sell MACtac to UPM. Plaintiffs alleged that this transaction was part of the unlawful conspiracy to restrain trade. They alleged that the sale price was half the amount Bemis had rejected for MACtac just two years earlier. Plaintiffs

3

further alleged that, simultaneous with this transaction, UPM agreed to sell its flexible

packaging business to Bemis, thus compensating Bemis for the loss of its PSL business by

doubling its market share in the European flexible packaging business.  As further evidence of

Bemis's knowledge and participation in an agreement to restrict price competition, Plaintiffs

alleged that MACtac's CEO, chosen by UPM to lead its North American PSL business,

predicted the transaction would bring pricing "discipline" to the market.

On March 31, 2004, Bemis and MACtac filed a motion to dismiss the Amended

Complaint.  (Dkt. Entry 55.)  The Court denied their motion in a Memorandum and Order issued

February 15, 2005, and reported at In re Pressure Sensitive Labelstock Antitrust Litigation, 356

F. Supp. 2d 484 (M.D. Pa. 2005).  After rejecting MACtac's and Bemis's contention that § 1

claims are subject to a heightened pleading standard, see id. at 491, the Court determined that

Plaintiffs adequately pled an antitrust claim against MACtac under the theory of conscious

parallelism.  The averment that MACtac and Avery did not compete for customers, coupled with

the averments that MACtac had newly developed excess capacity, that UPM entered the U.S.

market notwithstanding the excess production capacity because prices were maintained at

supra-competitive levels, and that MACtac's CEO and President decried UPM's price

competition as "ruin[ing] the industry," supported a reasonable inference of concerted action by

MACtac and Avery.  Id. at 493.

With respect to the claim against Bemis, the Court found that the Amended Complaint

alleged more than merely an agreement to sell MACtac to UPM.  Id. at 494.  By agreeing to exit

the PSL market, Plaintiffs alleged, Bemis acquired significant market share in the European

flexible packaging business.  This Court found that "[t]he complaint thus support[ed] a

reasonable inference of an agreement to allocate market shares as part and parcel of an effort

to restrain competition."  Id.  Additionally, Plaintiffs alleged that Bemis was aware of the

agreement to constrain price competition and knew the sale of MACtac furthered that

agreement.  Because it "ha[d] been given fair notice of the nature of Plaintiffs' claim, and the

theory of liability [was] neither irrational nor implausible," Bemis was not entitled to be

dismissed from the action.  Id.

On May 5, 2005, Plaintiffs filed a Motion for Leave to File a Second Amended

Complaint, (Dkt. Entry 149), which was granted on January 3, 2006.  (See Mem. & Order, Jan.

3, 2006, Dkt. Entry 189.)  The Second Amended Complaint restated allegations of the

Amended Complaint, but also included new averments based on information uncovered during

discovery regarding class certification.  (See Second Am. Compl., Dkt. Entry 190.)  All

Defendants, including MACtac and Bemis, answered the Second Amended Complaint.  (See

Dkt. Entries 195, 197, 198, 199.)

Twombly was decided May 20, 2007.  On September 18, 2007, Bemis and MACtac filed

their motion to dismiss.  (Dkt. Entry 304.)  The motion is fully briefed, (see Dkt. Entries 307,

5

317, 330), and oral argument was held December 11, 2007.  The matter is ripe for disposition.[4]

II. DISCUSSION

    A. Twombly

        Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy,

in restraint of trade or commerce."  15 U.S.C. § 1.  Three basic elements comprise a § 1 claim:

"(1) concerted or joint action of more than one party; (2) that unreasonably restrains trade; and

(3) that affects interstate trade or commerce."  In re Pressure Sensitive Labelstock, 356 F.

Supp. 2d at 489.  "The existence of an agreement is '[t]he very essence of a section 1 claim.'"

In re Flat Glass Antitrust Litig., 385 F.3d 350, 356 (3d Cir. 2004) (quoting Alvord-Polk, Inc. v. F.

Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994)).  Like their first motion to dismiss, Bemis

and MACtac challenge only the sufficiency of the Second Amended Complaint's allegations

pertaining to their purported involvement in concerted action.

------

[4]Plaintiffs filed a Motion for Class Certification and Appointment of Class Counsel on August 14, 2006.  (Dkt. Entry 244.)  In a Memorandum and Order issued November 19, 2007, the Court granted the motion and certified a class of persons who purchased paper-based and film-based PSL at any time during the class period, January 1, 1996, to July 25, 2003.  (Dkt. Entry 335.)  Defendants Avery, Bemis, and MACtac petitioned our Court of Appeals for leave to appeal the class certification decision.  See Fed. R. Civ. P. 23(f).  On March 6, 2008, the Third Circuit denied their petition.  (Dkt. Entry 361.)

Meanwhile, prior to issuing the class certification decision, the Court was notified of a pending settlement between Plaintiffs and UPM and Raflatac and presented with a stipulation staying this action as to UPM and Raflatac.  (Dkt. Entries 310 & 311.)  Class Plaintiffs moved for preliminary approval of the settlement, (Dkt. Entry 337), which the Court granted on April 11, 2008.  (Dkt. Entry 370.)  The Final Approval Hearing is scheduled for July 22, 2008.  (Id. at 8.)

In Twombly, the Supreme Court addressed the requirements for pleading a claim under § 1 of the Sherman Act.  Twombly, 127 S. Ct. at 1964.  Twombly involved a § 1 claim against providers of local telephone and high-speed Internet service.  Defendants, known as the "Baby Bells," were created after the break-up of AT&T in 1984, and each had enjoyed a government-sanctioned regional monopoly.  Id. at 1961.  Over ten years later, Congress signaled its disapproval of the monopolies by enacting the Telecommunications Act of 1996 to open the local telephone markets to competition from "competitive local exchange carriers."  Id.  Defendants, however, litigated the scope of the Act and resisted competition from CLECs.  Id.  Plaintiffs, subscribers of local telephone and/or high speed Internet services, commenced a class action alleging defendants violated § 1 by conspiring to restrain trade.  Id. at 1962.  Specifically, plaintiffs alleged that defendants conspired to hinder the competitive efforts of the CLECs and conspired to refrain from competing with one another.  Id.  The complaint contained no independent allegations of an agreement among defendants, but instead inferred an agreement from its description of parallel conduct, including allegations that defendants undertook similar measures to frustrate the CLECs' efforts and failed to pursue business opportunities "in contiguous markets."  Id. at 1962, 1970.  The district court dismissed the complaint, but the court of appeals reversed.  Id. at 1963.

The Supreme Court considered what must be pled to state a § 1 claim.  Important to its holding was Federal Rule of Civil Procedure 8(a)(2), which the Court observed "requires only 'a

short and plain statement of the claim showing that the pleader is entitled to relief,'" id. at 1964,

"in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it

rests.'" Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  A complaint need not contain

detailed factual allegations to survive a Rule 12(b)(6) motion. Id. But to show the grounds of

an entitlement to relief, a plaintiff must plead more than labels, conclusions, or a "formulaic

recitation of the elements." Id. at 1965.  "Factual allegations must be enough to raise a right to

relief above the speculative level on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)." Id. (citation omitted).  In light of these general principles, the

Court held that a § 1 claim

> requires a complaint with enough factual matter (taken as true) to suggest
> that an agreement was made.  Asking for plausible grounds to infer an
> agreement does not impose a probability requirement at the pleading stage; it
> simply calls for enough fact to raise a reasonable expectation that discovery
> will reveal evidence of illegal agreement. . . .  It makes sense to say . . . that
> an allegation of parallel conduct and a bare assertion of conspiracy will not
> suffice.  Without more, parallel conduct does not suggest conspiracy, and a
> conclusory allegation of agreement at some unidentified point does not supply
> facts adequate to show illegality.  Hence, when allegations of parallel conduct
> are set out in order to make a § 1 claim, they must be placed in a context that
> raises a suggestion of a preceding agreement, not merely parallel conduct
> that could just as well be independent action.

Id. at 1965-66 (footnote omitted); see also id. at 1966 (complaint's allegations must plausibly

suggest, not merely be consistent with, an agreement).

     In enunciating a plausibility standard, the Court retired the "no set of facts" language first

articulated in <u>Conley</u>.[5]  "This 'no set of facts' language can be read in isolation as saying that

any statement revealing the theory of the claim will suffice unless its factual impossibility may

be shown from the face of the pleadings."  <u>Id. at 1968</u>.  The Court reasoned that a literal

reading of <u>Conley</u> would permit even wholly conclusory statements of a claim to survive a

motion to dismiss.  Indeed, the Second Circuit appeared to have applied <u>Conley</u> in this manner

when it reinstated plaintiffs' complaint.  <u>Id.</u> (citing <u>Twombly v. Bell Atlantic Corp.</u>, <u>425 F.3d 99</u>,

106, 114 (2d Cir. 2005)).  Observing that <u>Conley</u>'s "no set of facts" language had been criticized

long enough, and thus "earned its retirement," the Court stated that the phrase "is best

forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint."  <u>Id. at 1969</u>.  Accordingly, <u>Conley</u> should no longer be understood

as setting forth "the minimum standard of adequate pleading to govern a complaint's survival."

<u>Id.</u>

    Applying the plausibility standard to plaintiffs' complaint, the Court agreed with the

district court that the complaint failed to state a § 1 claim.  With respect to plaintiffs' claim of a

conspiracy to resist competition from CLECs, the Court found nothing in the complaint that

suggested "the resistance to the upstarts was anything more than the natural, unilateral

---

[5]"[A] complaint should not be dismissed for failure to state a claim unless it appears
beyond doubt that the plaintiff can prove no set of facts in support of his claim which would
entitle him to relief."  <u>Conley</u>, <u>355 U.S. at 45</u>-46.

reaction of each [defendant] intent on keeping its regional dominance." Id. at 1971.  As for

plaintiffs' claim that defendants agreed to forbear competing with one another, the Court

observed that defendants were spawned as monopolists, "doubtless liked [it]," and thus it was

natural for them to do nothing, expecting their peers to do the same. Id. at 1972.  Moreover,

plaintiffs' complaint contained no allegations that noncompetition was against defendants'

economic interests, but rather gave every indication that defendants' attempts to enter other

markets would be greeted with the same vigorous resistance that thwarted efforts by CLECs.

Id. at 1972-73.  Without additional facts to support either theory, plaintiffs failed to "nudge[] their

claims across the line from conceivable to plausible," warranting dismissal of their complaint.

Id. at 1974.

Twombly was a significant decision with regard to pleading claims in general and

antitrust claims in particular.  Several principles from that decision inform this Court's

disposition of the pending motion.  First, while formulating a plausibility standard, Twombly

affirmed the general rule that pleading in federal court need only comply with Rule 8(a)(2).  The

complaint must give a defendant fair notice of the claim and the grounds upon which it rests,

which is satisfied by a "short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2).  A bare assertion of entitlement to relief does not

suffice. Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).

Second, whether a complaint shows a plausible entitlement to relief depends on its

10

context.  Rather than a blanket assertion of entitlement to relief, the Rule 8(a)(2) "showing" requires enough factual detail to provide a defendant with fair notice of the claim and the grounds therefor.  Twombly, 127 S. Ct. at 1965 n.3.  As explained in Phillips, 515 F.3d at 234, the "Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element[s]" of the cause of action asserted.

Third, the Court in Twombly disavowed the creation of a "heightened" pleading standard. Twombly, 127 S. Ct. at 1973 n. 14.  In this regard, the Court reaffirmed Swierkiewicz v. Sorema Nat'l Ass'n, 534 U.S. 506 (2002), where it held that the court of appeals impermissibly applied "what amounted to a heightened pleading requirement by insisting that [the plaintiff] allege 'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." Id. at 1973-74 (citing Swierkiewicz, 534 U.S. at 508); see also id. at 1264 ("a complaint . . . does not need detailed factual allegations").  The problem in Twombly was not the failure to plead specific or particularized facts; "rather, the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible." Id. at 1973 n. 14.

Finally, while jettisoning Conley's "no set of facts" language, Twombly left in place certain concepts.  "[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Phillips, 515 F.3d at 231 (citing Twombly,

127 S. Ct. at 1964-65, 1969 n.8).

The sufficiency of the allegations against MACtac and Bemis set forth in the Second Amended Complaint must be assessed in the context of these principles drawn form Twombly: the pleading must be considered in its entirety; the claims presented need not be alleged with particularity, but there must be sufficient factual averments that place the defendants on notice of the bases for the claims; and plaintiff's entitlement to relief on the bases for the claim presented against a particular defendant must be plausible.  Specifically, the question presented in the context of a § 1 claim is whether the complaint alleges enough facts to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 127 S. Ct. at 1965.  Because a parent company cannot conspire with its wholly-owned subsidiary for purposes of § 1 liability, see Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984), the sufficiency of the averments of the Second Amended Complaint must be assessed separately for MACtac and Bemis to determine whether the averments afford a basis for concluding that each participated in an illegal agreement or concerted action.

B. Allegations against MACtac

In denying the first motion to dismiss, this Court determined that "'[P]laintiffs' theory of conspiracy – an agreement among oligopolists [MACtac and Avery] to fix prices at a supracompetitive level – makes perfect economic sense'" because the Amended Complaint described "market conditions that support an inference that collusive conduct was both

12

plausible and in [Defendants'] economic interests." In re Pressure Sensitive Labelstock, 356 F. Supp. 2d at 493 & n.4 (quoting In re Flat Glass, 385 F.3d at 358.  Nothing in Twombly compels reversal of that determination.

The Second Amended Complaint alleges that MACtac and Avery did not compete for each other's customers.  (Second Am. Compl. ¶ 44.)  Unlike plaintiffs in Twombly, Plaintiffs here have situated this allegation of parallel conduct in the context of other averments plausibly suggesting concerted action.  During this period, Plaintiffs allege, there was considerable excess industry capacity, a substantial part of which was newly developed by MACtac.  (Id. ¶¶ 44-45.)  The lack of competition raised PSL prices to supra-competitive levels.  (Id. ¶ 46.)  Absent a preceding agreement, Plaintiffs allege that it made no sense economically for MACtac to idle its excess capacity.  (Id. ¶ 45.)[6]  Additionally, Plaintiffs allege that UPM entered the United States PSL market, notwithstanding the existence of excess capacity, and successfully undercut prices by ten percent or more.  (Id. ¶ 46.)  See In re Flat Glass, 385 F.3d at 362 (entry of a competitor into the market indicates that existing producers were "charging supracompetitive prices"); Richard A. Posner, Antitrust Law 89 (2d ed. 2001) ("The charging of a monopoly price will attract new competitors to a market who perceive opportunities for

---

[6]The existence of excess PSL production capacity in general is characteristic of an industry conducive to coordinated behavior.  See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 657 (7th Cir. 2002) (Posner, J.,) ("And the defendants had a lot of excess capacity, a condition that makes price competition more than usually risky and collusion more than usually attractive.").

unusual profits by reason of the abnormally high price."). These factual allegations, taken as true, plausibly suggest that MACtac conspired with Avery to restrain competition, and are more than adequate to give fair notice to MACtac of Plaintiffs' claim and the grounds upon which it rests.[7]

The other allegations of the Second Amended Complaint – that MACtac conspired with Avery to stabilize and raise PSL prices – also satisfy Twombly.  Here, Plaintiffs allege that MACtac announced a price increase that was followed shortly thereafter by Avery.  (Second Am. Compl. ¶ 55.)  Two allegations plausibly suggest this parallel behavior was concerted, not independent, action.  First, concerned about the risk of price erosion due to Raflatac's anticipated expansion in the United States, MACtac and Avery personnel, Plaintiffs aver, held direct discussions about the need to collaborate on price increases during the October, 2000,

---

[7]New allegations in the Second Amended Complaint raise additional inferences supporting Plaintiffs' theory. First, Plaintiffs allege that Avery sought to "create an oligopoly" with MACtac. (Second Am. Compl. ¶ 44.)  The absence of competition among the largest producers of PSL suggests that Avery realized its objective. Second, Plaintiffs allege that Avery and UPM negotiated an agreement whereby Avery agreed to purchase label papers from UPM in consideration for UPM's promise to abstain from expanding its PSL business in the United States. (Id. ¶ 48.)  Although MACtac was not a party to this agreement, Plaintiffs allege that as early as 1998 MACtac knew of the agreement – despite Avery's and UPM's agreement to keep their arrangement confidential. (Id. ¶ 49.)  That MACtac was aware of the agreement, and that its forbearance from competing with Avery was consistent with Avery's and UPM's own non-compete agreement, suggests its participation in an overarching conspiracy to restrain competition. See In re Flat Glass, 385 F.3d at 363.  When viewed in conjunction with the allegations of excess capacity and supra-competitive prices – all of which are accepted as true for purposes of this motion – these averments suggest MACtac's behavior was not independent action, but, instead, the product of an agreement.

14

conference of the Tag & Label Manufacturers Institute ("TLMI").  (Id. ¶¶ 53-54.)  Just one month

later, MACtac, followed by Avery, raised PSL prices.  (Id. ¶ 55.)  Second, MACtac initiated the

November, 2000, price increase.  (Id.)  Plaintiffs aver that this move was unusual because

MACtac acknowledged that Avery was the price leader and recognized that leading a price

increase was contrary to its self-interest and risky if Avery declined to follow.  (Id.)  Given the

temporal proximity of the price increase to the TLMI conference and MACtac's historical

reticence to spearhead price increases, these allegations plausibly suggest MACtac raised

prices pursuant to a prior understanding with Avery.

MACtac's arguments appear to be a re-hash of its previously rejected advocacy for a

heightened pleading standard in antitrust conspiracy cases.  But the Court in Twombly stressed

that it was not adopting a heightened pleading standard.  What is required is that the pleading

satisfy the requirements of Rule 8(a)(2) with a short and plain statement showing that the

plaintiff is entitled to relief and giving fair notice of the claim and grounds therefor.  The Second

Amended Complaint meets this standard.

MACtac does advance more specific contentions in support of its motion, none of which

are persuasive.  First, MACtac argues that the Second Amended Complaint is analogous to the

complaint in Twombly, which by itself warrants a decision in its favor.  (See Mem. Law Supp.

Defs.' Bemis's & MACtac's Mot. Dismiss Second Am. Compl. ("Defs.' Mem. Law"), Dkt. Entry

307, at 11-13.)  To support this contention, MACtac refers to Paragraph 68 of the Second

Amended Complaint, an averment that summarizes Defendants' alleged § 1 violations.  (See id. at 12 (quoting Second Am. Compl. ¶ 68).)  MACtac argues that "[t]hese allegations fail to provide the necessary plausible factual context with specific time, place or persons involved in the alleged conspiracy."  (Id. (citing Twombly, 127 S. Ct. at 1970 n. 10).)  But the Second Amended Complaint contains more than a conclusory assertion of Defendants' alleged violations.  Plaintiffs allege that MACtac and Avery agreed to refrain from competing with each other and agreed to fix or stabilize PSL prices.  The allegations of observed conduct – actual forbearance from competition for customers, parallel price increases, and excess production capacity – are placed among other factual allegations that plausibly suggest a preceding agreement.  The complaint in Twombly, however, contained only conclusory allegations of parallel conduct without the requisite factual showing plausibly suggesting an agreement.[8]

---

[8]The cases cited by MACtac and Bemis decided post-Twombly and resulting in dismissal of antitrust complaints are not to the contrary.  Like Twombly, those cases involved antitrust complaints that rested solely on allegations of parallel conduct.  For example, in Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1048 (9th Cir. 2008), plaintiffs alleged that defendant banks conspired to fix fees charged to merchants in the processing of credit card transactions.  Other than their allegation that the banks charged similar fees, plaintiffs failed to plead any facts suggesting a conspiracy, and their complaint was dismissed.  Id.  In In re Late Fee and Over-Limit Fee Litigation, 528 F. Supp. 2d 953, 961-62 (N.D. Cal. 2007), plaintiffs alleged that defendant banks conspired to fix late fees assessed on credit card accounts, but their complaint lacked any facts plausibly suggesting a preceding agreement.  (See also Ex. A to Bemis's & MACtac's Notice Supplemental. Auth. Supp. Mot. Dismiss, Dkt. Entry 375-2; Exs. 1-2 to Bemis's & MACtac's Notice Supplemental Auth. Supp. Mot. Dismiss, Dkt. Entries 366-2 & 366-3.)  The Second Amended Complaint, however, goes beyond allegations of parallel conduct and describes market conditions, discussions between MACtac and Avery personnel, and other facts that suggest MACtac acted pursuant to an agreement.

Moreover, <u>Twombly</u> must be read in light of the industry at issue.  Defendants were state-created monopolists compelled by the Telecommunications Act to subsidize competition in their respective territories.  Because of the nature of the industry, plaintiffs' allegations that defendants resisted entry by CLECs, yet refused to become CLECs themselves and were content with maintaining their own regional territories, amounted to nothing more than a description of natural market behavior.  Here, by contrast, the Second Amended Complaint avers a market susceptible to collusion and, taking the allegations as true, was in fact affected by coordinated actions of Defendants, supporting a reasonable inference of concerted action. As such, <u>Twombly</u> is distinguishable and affords no basis for dismissing MACtac from this action.

Second, at oral argument, counsel for MACtac and Bemis argued that <u>Twombly</u> instructs district courts to assess each allegation separately and, if the allegation is consistent with competitive behavior, it must be disregarded when determining whether plaintiff has pleaded a § 1 claim.  (Oral Argument Tr., Dec. 11, 2007, Dkt. Entry 349, at 10-11.)  Using this approach, MACtac contends that certain allegations in the Second Amended Complaint, such as refraining from competing with Avery, idling excess capacity, participating in parallel price increases, and leading a price increase, are consistent with purely unilateral, competitive behavior and cannot plausibly suggest a preceding agreement.  (See Defs. Mem. Law 14-16.)

Nothing in <u>Twombly</u>, however, contemplates this "dismemberment" approach to

assessing the sufficiency of a complaint.  Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review.  As the Court itself observed, "the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible."  Twombly, 127 S. Ct. at 1973 n. 14; see also In re Flat Glass, 385 F.3d at 369 ("A court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence." (citing Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1364-65 (3d Cir. 1992))); In re Se. Milk Antitrust Litig., — F. Supp. 2d —, MDL No. 1899, Master File No. 2:08-MD-1000, 2008 WL 2117159, at *7 (E.D. Tenn. May 20, 2008) ("Moreover, defendants attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition that '[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'" (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) (quotation omitted)).  In this case, for example, MACtac contends that the Second Amended Complaint's allegation that it chose not to utilize its excess capacity, without additional facts explaining this decision, is facially neutral, consistent with rational market behavior, and supports no inference of conspiratorial conduct. (See Defs. Mem. Law 14; Reply Mem. Supp. Defs.' Bemis's & MACtac's Mot. Dismiss Second Am. Compl. ("Defs.' Reply Mem."), Dkt. Entry 330, at 13.)  But when the allegation of excess capacity is considered in the context that MACtac's excess capacity was newly developed, that there was industry-wide excess capacity, that a competitor entered the market in the face of

excess capacity and managed to cut prices by ten percent (indicating prices were supra-competitive), and that MACtac refrained from competing with Avery over customers, the allegation plausibly suggests that MACtac acted in concert, rather than out of economic self-interest.

Finally, MACtac contends that the allegation in Paragraph 54 of the Second Amended Complaint – that MACtac and Avery personnel held discussions regarding the need to work jointly to stabilize and raise PSL prices – is negated by the email upon which it is purportedly based. (Defs. Mem. Law 17-19.) In this regard, Plaintiffs alleged that, during the TLMI conference held in October, 2000, "Avery and MACtac personnel discussed Raflatac's entry into the U.S. market . . . and the need to work jointly to increase prices, according to a MACtac employee who attended the conference." (Second Am. Compl. ¶ 54 (emphasis added).) MACtac identifies that employee as R. Curtis Clarke and argues that the factual predicate for Paragraph 54 is an October 19, 2000, email authored by Mr. Clarke. (Defs. Mem. Law 17.) A response to an inquiry about the feasibility of a price increase, the Clarke email (the relevant contents of which are set forth below[9]) was apparently produced during discovery regarding

---

[9]In relevant part, the email states:

We are currently examining several price increase options and will make a decision in the next few weeks. The mood at the TLMI conference was very cautious. Generally, the feedback is that Avery . . . is not doing well. I doubt that they will follow a price increase given their traditional concern over share maintenance/growth and fear that Raflatac may not follow. Other: Lots of

class certification.  MACtac contends that the email, "fairly read, . . . not only does not support

plaintiffs' allegation that there were direct communications between Avery and MACtac about

increasing prices, but also refutes plaintiffs' allegations."  (Id.)  And, because Plaintiffs "clearly

paraphrased" the email, yet omitted it from their Second Amended Complaint, MACtac urges

the Court to consider the email in deciding its motion and that to do so will not convert the

motion to one for summary judgment.  (Id. at 19 (quoting In re Burlington Coat Factory Sec.

Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).)

        In general, a district court ruling on a motion to dismiss (or for judgment on the

pleadings) may not consider matters outside the pleadings.  In re Burlington Coat Factory, 114

F.3d at 1426.  "[A]n exception to the general rule is that a 'document integral to or explicitly

relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into

---

sidebar conversations about Raflatac. . . .  Plenty of supplier grumbling about
the questionable business value of the conference versus enormous
expenses to attend.  Nothing really new here but the noise was louder
indicating how painful this year has been from a profit perspective.  As one
very big competitor put it "let's face it.  We are being held hostage here.  Back
out and you will be punished."  My own supplier committee members
discussing their use of the Roll Stock Statistics to support their assertions to
their own senior management and analysts that this past year has been ugly
(units up; selling prices down; working harder to earn less).  Another strong
indication of both the need for price increases but the fear of share loss if
even one big player doesn't follow.  Obviously, we did not have any such
overtly direct conversations but the message was absolutely crystal clear.

(Ex. A to Defs. Mem. Law, Dkt. Entry 307-2.)

one for summary judgment.'" Id. at 1426 (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  A document is integral to the complaint when the allegations in the complaint are based on the document.  Id.  Plaintiffs do not dispute that Paragraph 54 was based on the Clarke email and even argue that the email supports their claim against MACtac. (See Pls.' Mem. Law Opp'n to Defs. Bemis's & MACtac's Mot. Dismiss Second Am. Compl. ("Pls.' Opp'n Mem."), Dkt. Entry 317, at 17-18; Oral Argument Tr. 28.)  Rather, they object to Bemis and MACtac "select[ing] a single document, produced in class discovery before Plaintiffs have had an opportunity to conduct any merits discovery, and ask the Court to draw inferences from it only in their favor." (Pls.' Opp'n Mem. 18.)

Assuming Paragraph 54 is based on the Clarke email, the Court notes that the email arguably contradicts Plaintiffs' allegations in part.  Mr Clarke's statement that he doubts Avery will follow a price increase tends to negate the allegation that MACtac and Avery personnel had direct discussions regarding PSL prices and that MACtac acted with the understanding that Avery would follow a price increase.  On the other hand, the email supports a reasonable inference in favor of Plaintiffs that Mr. Clarke had discussions with other PSL producers about price increases since the need for such increases, though not overtly communicated, was a message "absolutely crystal clear."  Moreover, the statement, "[b]ack out and you will be punished," supports the existence of an anti-competitive arrangement.  At a minimum, this email is sufficiently ambiguous to support an inference of an anti-competitive agreement.  In

any event, the Court will not dismiss the Second Amended Complaint merely because there exists some discrepancy between this ambiguous email and an averment in the pleadings. Significantly, the Clarke email is not a legal instrument, like a collective bargaining agreement or other contract, that would dispose of Plaintiffs' action.  It suffices at this stage of the proceeding that the Second Amended Complaint sets forth sufficient factual allegations that plausibly suggest MACtac engaged in concerted action in violation of § 1.

In summary, the Second Amended Complaint contains enough factual allegations to plausibly suggest MACtac's participation in a conspiracy to restrain trade.  Plaintiffs plead more than conclusory assertions of conspiracy; they describe behavior and market conditions that suggest MACtac's conduct was something other than a natural, unilateral reaction to market forces.  Furthermore, the Second Amended Complaint provides MACtac with fair notice of Plaintiffs' claim and the grounds upon which it is based.  Whether Plaintiffs will ultimately prove these allegations is a question reserved for another day.  Because Plaintiffs have "nudge[d] their claims across the line from conceivable to plausible," MACtac's motion to dismiss must be denied.

C. Allegations against Bemis

Bemis cannot be held liable in this action merely because a viable Sherman Act claim has been asserted against its subsidiary.  In this regard, Plaintiffs cannot attribute to Bemis the conduct of MACtac.  Indeed, as noted in this Court's decision addressing the first motion to

dismiss filed by Bemis and MACtac, Plaintiffs explicitly disavowed any vicarious liability claim against Bemis.  See In re Pressure Sensitive Labelstock, 356 F. Supp. 2d at 494.

Thus, Plaintiffs must allege facts from which it may be inferred that Bemis itself, as opposed to its subsidiary, was party to an agreement to restrain trade in the PSL industry. Allegations that are equally consistent with legal conduct as with illegal conduct are insufficient to state a viable § 1 claim against Bemis.

Plaintiffs allege that Bemis regarded MACtac as a valuable asset because MACtac's agreement with Avery enabled MACtac to maintain supra-competitive prices.  (Second Am. Compl. ¶ 44.)  This averment, however, does not support an inference that Bemis was a party to such an agreement.  Moreover, the fact that Bemis rejected UPM's initial offer to purchase MACtac, as alleged in Paragraph 50 of the Second Amended Complaint, cannot be regarded as consistent with participation in a conspiracy to restrain trade.

Nor does the averment that Bemis later agreed to sell MACtac to UPM for half the price of the initial offer support an inference that Bemis was a knowing participant in concerted anti-competitive conduct.  Plaintiffs allege:

> 61.     Having been a prior participant in coordinated conduct, Bemis and MACtac continued as willing participants in Defendants' conspiracy to control prices in the market, by, among other things, agreeing to sell MACtac to UPM-Kymmene.  Furthermore, simultaneous with Bemis' agreement to sell its pressure sensitive labels business to UPM-Kymmene, UPM-Kymmene agreed to sell a European flexible packaging entity to Bemis on favorable terms, thus enabling Bemis to compensate for the loss of its sensitive labels business in North America by doubling its market share of its flexible

23

packaging business in Europe.

62.   Bemis was not an ignorant third party that was merely attempting to sell a business to UPM-Kymmene.  In fact, Bemis and MACtac knew about UPM-Kymmene's agreement with Avery to refrain from future price competition.  By March 2001, Bemis and MACtac had concluded that a sale of MACtac to UPM-Kymmene would prevent a "pricing bloodbath for UPM as they try to capture North American market share" and "long-term damage" to the U.S. labelstock market.  Prior to the attempted closing of the sale, MACtac's CEO, who had been selected by UPM-Kymmene to head its North American labelstock business after the transaction, stated that the transaction should bring pricing "discipline" to UPM-Kymmene, a statement which would make no sense unless Bemis and MACtac knew of UPM-Kymmene's collusive agreement with Avery to exercise price discipline.

(Second Am. Compl. ¶¶ 61-62.)

Knowledge of the existence of an agreement by Avery and UPM to restrain competition does not support an inference that Bemis was a co-conspirator.  Moreover, Plaintiffs' bald averment that Bemis was "a prior participant in coordinated conduct" is not substantiated by any allegation of fact in the Second Amended Complaint.  Twombly made clear that sprinkling a complaint with conclusory assertions that a party was a "participant in coordinated conduct" or a "conspirator" or acted in "concert" with others does not make the requisite showing of entitlement to relief mandated by Rule 8(a)(2).  See Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 577 (S.D.N.Y. 2007).

As Bemis argues, the sale of MACtac to UPM does not support an inference that Bemis was a knowing participant in an agreement to restrain trade by fixing PSL prices.  Its decision to sell is entirely consistent with Bemis pursuing its own economic interests in light of UPM's entry

into the PSL industry in the United States.  The Second Amended Complaint itself provides an explanation for the decision to sell MACtac that is the product of a "'rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" In re Late Fee & Over-Limit Fee Litig., 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007) (quoting Twombly, 127 S. Ct. at 1964).  Raflatac's entry into the market was perceived as creating the specter of declining prices with idle production capacity, a plainly disadvantageous scenario.  Bemis could rationally view this development as depreciating the value of its subsidiary.  A decision to exit the PSL market while expanding its stake in a different industry in Europe is entirely consistent with Bemis's own economic interests, and not the product of an agreement to perpetuate a price fixing scheme in the PSL market.  Furthermore, the fact that the purchase of the flexible packaging business by Bemis was consummated while UPM's acquisition of MACtac was barred negates an inference of an agreement to restrain competition in the PSL industry by allocating markets.

In denying the first motion to dismiss, this Court considered significant the allegation that, as part of the sale of MACtac, Bemis acquired market share in the flexible packaging business in Europe.  This averment was viewed as tantamount to an agreement to allocate market shares in violation of the Sherman Act.  As Bemis points out, however, Plaintiffs have not asserted a claim for relief on the ground that the agreement to buy the flexible packaging business was itself actionable as an attempt to allocate market shares.  Instead, Plaintiffs claim

that this agreement was intended to further the agreement of Avery and UPM to fix prices.  An inference of knowing participation in a scheme between Avery and UPM to fix prices, however, cannot be drawn from an agreement to sell MACtac.  As argued by Bemis's counsel, "what motive or incentive does Bemis have to be participating in the conspiracy by getting out of the industry?" (Oral Argument Tr. 18.)

In summary, the agreement to sell MACtac does not support an inference that Bemis was a co-conspirator to restrain trade in the PSL industry in the United States by allocating market share or fixing prices.  Plaintiffs have alleged no other facts upon which to premise a Sherman Act § 1 claim against Bemis.  Accordingly, Bemis will be dismissed from this action.

III. CONCLUSION

For the reasons stated, Defendants Bemis's and MACtac's Motion to Dismiss is granted as to Bemis, but denied as to MACtac.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE: PRESSURE SENSITIVE         :
LABELSTOCK ANTITRUST              :
LITIGATION                        :         MDL Docket No. 1556
                                  :         (No. 3:03-MDL-1556)
                                  :         (All Cases)
                                  :
                                  :         (JUDGE VANASKIE)
                                  :

## ORDER

NOW, THIS 24th DAY OF JUNE, 2008, for the reasons set forth in foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants Bemis Company, Inc.'s and Morgan Adhesive Company's Motion to Dismiss Second Amended and Consolidated Class Action Complaint (Dkt. Entry 304) is GRANTED as to Bemis, and Plaintiffs' claim against Bemis is DISMISSED.  In all other respects, the motion to dismiss is DENIED.

2. A conference concerning a schedule for merits-based discovery shall be held on Tuesday, July 22, 2008, at 11:00 a.m.  The conference shall take place prior to the Final Approval Hearing that will be conducted in connection with the proposed settlement of Plaintiffs' claims against UPM-Kymmene and Raflatac, Inc.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge